HANOVER INSURANCE COMPANY,
Plaintiff, Appellee,

v.

SHULMAN TRANSPORT ENTERPRIS-
ES, INC., et al., Defendants,
Appellants.

No. 77–1187.

United States Court of Appeals,
First Circuit.

Argued Feb. 8, 1978.
Decided July 25, 1978.

A. Rivera Valdivieso, Hato Rey, P. R., for defendants, appellants.

Charles A. Cordero, San Juan, P. R., for plaintiff, appellee.

Before COFFIN, Chief Judge, BOWNES and MOORE,* Circuit Judges.

MOORE, Circuit Judge:

This is an appeal by Shulman Transport Enterprises, Inc. ("Shulman") from a summary judgment in the amount of $8,346.62 entered in a subrogation action brought by consignee's insurance carrier, Hanover Insurance Company ("Hanover"), for damages caused to a C–45 Bliss Press during ship-

* Of the Second Circuit, sitting by designation.

1. In small type on the face of the bill of lading is written: "The company will not pay over

ment from New York, New York to San Juan, Puerto Rico. The case presents the important question whether a shipping carrier can limit its liability below the $500 per package, or customary freight unit, provision of § 4(5) of the Carriage of Goods by Sea Act ("COGSA"), 46 U.S.C. § 1304(5). There is no question as to Shulman's liability; the only issue is as to the correct measure of damages.

The facts are not in dispute. On November 19, 1973 Shulman received a C–45 Bliss Press in good condition for shipment from New York to San Juan. The press weighed over 1,000 pounds and was shipped in open view, unboxed, uncrated, and without any type of shipping skids. During the course of shipment the press was heavily damaged due to the negligence of Shulman or its employees. Hanover paid its insured $8,221.62 for the damage to the press and expended $125 in survey fees.

At the status conference before trial the parties stipulated as to the facts and limited their dispute to the validity of a clause, which is a part of Shulman's short form bill of lading, limiting Shulman's liability to $50 per shipment.[1] The parties stipulated into evidence the short form bill of lading and Shulman's "Rules and Regulations—FMC–F–No. 1", which was on file with the Federal Maritime Commission ("FMC"). These rules and regulations augment the short form bill of lading and state in more detail the purported limitation of liability:

"All shipments are governed by the following terms, conditions, and provisions which are hereby made a part of the Carrier's Bill of Lading through incorporation therein or by reference to this item.

a) In consideration of the rate charged for carriage, being dependent on the value of the goods and being based upon an agreed valuation of not more than fifty ($50.00) dollars per shipment, unless a greater value is declared at the time of

$50, in case of any loss, for any shipment, unless a greater value is declared and charges for such greater value paid." App. 15.

shipment and an additional charge thereof paid, the shipper or owner of the goods agrees that Carrier shall not be liable in any event for more than the value so declared, nor unless a greater value is declared, for more than $50.00 or more than the actual value if same is less than $50.00. . . ." App. 16.

Appellant contends that the limitation clause was not an invalid attempt to exempt itself from liability, but rather a valid declaration of the actual value. Appellant also argues that the limitation provision did not violate COGSA, because by filing the rules and regulations with the FMC as part of its tariff schedule, these had the approval of the FMC. As such, it argues that the tariff schedule, as a matter of public record, gave constructive notice of its contents and had the force and effect of a statute.

 The parties stipulated that the dispute is governed by COGSA, 46 U.S.C. § 1300 *et seq.*[2] The applicable clause relating to limitation of liability is § 4(5) of COGSA, which states:

"Neither the carrier nor the ship shall in any event be or become liable for any loss or damage to or in connection with the transportation of goods in an amount exceeding $500 per package lawful money of the United States, or in case of goods not shipped in packages, per customary freight unit, or the equivalent of that sum in other currency, unless the nature and value of such goods have been declared by the shipper before shipment and inserted in the bill of lading. . . ." 46 U.S.C. § 1304(5).

COGSA also provides that the carrier may not relieve itself by contractual arrangement from liability:

"Any clause, covenant, or agreement in a contract of carriage relieving the carrier or the ship from liability for loss or damage to or in connection with the goods, arising from negligence, fault, or failure in the duties and obligations provided in this section, or lessening such liability otherwise than as provided in this chapter, shall be null and void and of no effect. . . ." 46 U.S.C. § 1303(8).

In light of the legislative history, prior court interpretations, and sound policy underlying COGSA, we reject appellant's arguments and hold the limitation of liability inserted in the bill of lading must fail.

Because of the importance of this question to those involved in shipping—shippers, carriers and their respective underwriters—a somewhat extended examination of COGSA's history is warranted.[3] Under the common law, the carrier was absolutely liable for damage to cargo, unless it was not negligent and the damage was caused by Act of God, the public enemy, inherent vice, or fault of the shipper. *See* Gilmore & Black, *The Law of Admiralty*, 119 (1957). In order to reduce their exposure to this liability, carriers began inserting various "exceptions" in their bills of lading. Certain of these exceptions were rejected by courts of the day as void as against public policy since such contracts were not, in reality, consensual agreements.[4]

---

**2.** 49 Stat. 1207 (April 16, 1936).

The law which applies to coastwise traffic, which includes maritime traffic between the United States and Puerto Rico, is the Harter Act. *See Federal Insurance Company v. Transconex, Inc.*, 430 F.Supp. 290, 294 (D.P.R.1976). However, the parties, by making the contract subject to the terms of COGSA, made COGSA apply "as fully as if subject [thereto by the express provisions of COGSA]." 46 U.S.C. § 1312. *See Pan American World Airways, Inc. v. California Stevedore and Ballast Company*, 559 F.2d 1173, 1175 n.3 (9th Cir. 1977); *Petition of Isbrandtsen Co. v. United States*, 201 F.2d 281, 285 (2d Cir. 1953). For a comparison of the Harter Act and COGSA, *see*

Gilmore & Black, *The Law of Admiralty* 124–27 (1957).

**3.** More comprehensive discussions of the history of COGSA are provided in Knauth, *Ocean Bills of Lading* 113–131 (1953); Gilmore & Black, *The Law of Admiralty* 119–124 (1957); 2A *Benedict on Admiralty* 2-1—2-15 (1977).

**4.** *See, e. g., Liverpool & Great Western Steam Co. v. Phenix Insurance Co.*, 129 U.S. 397, 441, 9 S.Ct. 469, 32 L.Ed. 788 (1889). As stated by Justice Frankfurter:

"Although the courts upheld some such efforts [to limit liability], they reserved the right to refuse to enforce contractual exemptions from liability which trenched upon judi-

To meet the exemptions being written into bills of lading, in 1893 Congress passed the Harter Act, 46 U.S.C. § 190 *et seq.*,[5] which applied, and still applies, to domestic shipping. The Harter Act was a Congressional compromise between the shippers who wanted the carriers to be responsible for all negligence and the carriers who wanted full exemption from negligence claims.

"The carriers were relieved of their judicially imposed insurers' liability. In return they were required to forego the possibility of avoiding by contract certain specified obligations. Finally, if those obligations were in fact performed [a proviso eliminated in COGSA], recovery against the carrier for damages to cargo due to faulty navigation was altogether disallowed." *United States v. Atlantic Mutual Insurance Co.*, 343 U.S. 236, 245, 72 S.Ct. 666, 671, 96 L.Ed. 907 (1952) (dissenting opinion).

The success of the Harter Act provided a basis for the Hague Rules of 1921, as modified by the Brussels Convention of 1924.[6] COGSA, in turn,

"was lifted almost bodily from the Hague Rules . . . .. The effort of those Rules was to establish uniform ocean bills of lading to govern the rights and liabilities of carriers and shippers *inter se* in international trade." *Robert C. Herd & Co., Inc. v. Krawill Machinery Corp.*, 359 U.S. 297, 301, 79 S.Ct. 766, 769, 3 L.Ed.2d 820 (1959).

■ The purposes of the Hague Rules and COGSA have been characterized in var-

cial notions of public policy. The most important limit thus set to the power of the carrier to contract out of his common-law liability was the rule that courts would strike down any stipulation which relieved the carrier for hire from liability for damage caused by its own negligence. . . . Underlying the decision was the premise that such an agreement, if enforced, would tend to relax the vigilance and care in seamanship which the threat of liability encouraged." *United States v. Atlantic Mutual Insurance Co.*, 343 U.S. 236, 244, 72 S.Ct. 666, 670, 96 L.Ed. 907 (1952) (dissenting opinion) (footnote and citations omitted).

5. 27 Stat. 445 (Feb. 13, 1893). As stated by a later congressional committee report, the Harter Act

"was an outgrowth of attempts which had been made to limit so far as possible the liability of the vessel and her owners, by inserting in bills of lading stipulations against losses arising from unseaworthiness, bad storage, negligence in navigation, and other forms of liability which had been held by the courts of England, if not of this country, to be valid as contracts and to be respected even when they exempted the ships from the consequence of their own negligence." H.R. Rep. No. 2218, 74th Cong., 1st Sess. 7 (March 23, 1936).

6. COGSA was, in effect, implementing legislation passed in connection with the International Convention for the Unification of Certain Rules Relating to Bills of Lading, August 25, 1924, 51 Stat. 233 (1937), T.S. No. 931, the ratification of which, with reservations and an understanding, was deposited at Brussels on June 29, 1937. The full text of the reservations and understanding are reprinted at 51 Stat. 261–62 (1937).

The language of COGSA mirrors that of the Convention, with only a few deviations. *See* 51 Stat. 269–74 (1937). One deviation pertains to the limitation of liability provision. Under § 4(5) of the Hague Rules a carrier's liability was limited to 100 pounds sterling "per package or unit" (corresponding to $500 lawful money of the United States, *see* First Understanding reprinted in Knauf, *Ocean Bills of Lading* 77 (1953) ). Under COGSA the $500 limit applies "per package . . . or in the case of goods not shipped in package, per customary freight unit . . . .." 46 U.S.C. § 1304(5). The change was made because it was contended that "the expression 'per package or unit' in this section [4(5)] is ambiguous as it is not clear whether both terms are applicable to goods shipped in packages or whether the term 'unit' is to be applied only to goods not shipped in packages." *Executive E—A Treaty Entitled International Convention for Unification of Certain Rules in Regard to Bills of Lading for Carriage of Goods by Sea. Hearings before a Subcommittee of the Committee on Foreign Relations, United States Senate*, 70th Cong., 1st Sess. 29 (Dec. 22, 1927). Whether such a change resulted in clarification was questioned by Judge Charles M. Hough, an American delegate to the conference:

"It seems to me that one who can not understand the expression 'per package or unit' does not wish to understand it, if he has the slightest acquaintance with transportation language and custom.

\* \* \* \* \* \*

I can only submit that the words used in the bill . . . mean exactly the same thing as 'per package or unit'." *Id.* at 32.

ious ways by the courts. One purpose was "to carry over into the international sphere the uniformity achieved for American voyages in the Harter Act by mitigating the common-law 'insurer's' liability of carriers, in exchange for a prohibition of a clause in the contract of carriage lessening the carriers' liability". *Scarburgh v. Compania Sud-American de Vapores*, 174 F.2d 423, 424 (2d Cir. 1949). *See Pan-Am Trade & Credit Corp. v. The Campfire*, 156 F.2d 603 (2d Cir.), *cert. denied sub nom., Waterman Steamship Corp. v. Pan-American Trade & Credit Corp.*, 329 U.S. 774, 67 S.Ct. 194, 91 L.Ed. 666 (1946). A second purpose of the legislation was "to effectuate a standard and uniform set of provisions for ocean bills of lading", *Encyclopaedia Britannica, Inc. v. SS Hong Kong Producer*, 422 F.2d 7, 11 (2d Cir. 1969), "to counteract the persistent efforts of carriers, who are the drafters of ocean bills of lading, to insert all embracing exceptions to liability", *Tessler Brothers (B.C.) Ltd. v. Italpacific Line*, 494 F.2d 438, 444 (9th Cir. 1974), and "to obviate the necessity for a shipper to make a detailed study of the fine print clauses of a carrier's regular bill of lading on each occasion before shipping a package". *Id.* at 445. *See Encyclopaedia Britannica, supra* at 14.

These various purposes were explicitly considered by Congress. The House committee report accompanying COGSA defined the purpose as:

"to define by law the rights and liabilities of water carriers and shippers in foreign commerce. *It fixes an irreducible minimum of immunity of the carrier from liability.*" H.R.Rep. No. 2218, 74th Cong., 2d Sess. 1 (March 23, 1936). (emphasis added) [Hereafter H.Rep.].[7]

Congress considered § 4(5) to be an important provision in both the Hague Rules and COGSA. In Senate hearings it was stated:

"Another beneficial and noteworthy provision of the Hague Rules is the stipulation which makes the carrier liable for loss or damage up to £100 per package, or unit, unless a greater value shall have been declared by the shipper and inserted in the bill of lading. This is important when we recall that present limits are usually $100 or $250; in fact, one instance is recorded of a limit of 10 francs." Hearings before the Senate Committee on Commerce on S. 1152, 74th Cong., 1st Sess. 47 (1935).

*See Hartford Fire Insurance Company v. Pacific Far East Line, Inc.*, 491 F.2d 960, 962 n.3 (9th Cir.), *cert. denied*, 419 U.S. 873, 95 S.Ct. 134, 42 L.Ed.2d 112 (1974); *Jones v. The Flying Clipper*, 116 F.Supp. 386, 388 n.10 (S.D.N.Y.1953). Additionally the committee report accompanying the House bill stated:

"Valuation clauses in bills of lading frequently restrict the recovery to an agreed valuation as low as $100. This bill increases that limit to $500 per package or customary freight unit." H.Rep. at 8.

■ Courts faced with interpreting the statutory provisions of COGSA have consistently determined that the $500 limitation of liability provision of § 4(5) serves as

---

7. The committee report lists the most outstanding benefits of the legislation as including:

"[S]implifications and uniformity of bills of lading, . . . increased valuation, . . . and denial to the carrier of power to exempt itself from various classes of liability by riders and exempting clauses in bills of lading at present so numerous and so technical as to create confusion and to occasion untold litigation." H.Rep. at 6–7.

The committee noted:

"The uniformity and simplification of bills of lading will be of immense value to shippers who will be relieved of the necessity of closely examining all bills of lading to determine the exceptions contained therein to ascertain their rights and responsibilities; to underwriters who insure the cargo and are met with the same difficulties; and to bankers who extend crédit upon the bills of lading.

There are in existence hundreds of different forms of bills of lading with varying exceptions which will be eliminated by this legislation. This lack of uniformity creates an undesirable condition in business which will largely be corrected by this bill." *Id.*

a *minimum* level of valuation. As stated by the Second Circuit:

"[T]he purpose of § 4(5) was to set a reasonable figure below which the carrier should not be permitted to limit his liability . . . ." *Leather's Best, Inc. v. S.S. Mormaclynx,* 451 F.2d 800, 815 (2d Cir. 1971).

*See Shinko Boeki Co., Ltd. v. S.S. "Pioneer Moon",* 507 F.2d 342, 344–45 (2d Cir. 1974); *Tessler Brothers (B.C.) Ltd. v. Italpacific Line, supra* at 443 n.6; *Hartford Fire Insurance Co. v. Pacific Far East Lines, Inc.,* 491 F.2d 960, 962 (9th Cir.), *cert. denied,* 419 U.S. 873, 95 S.Ct. 134, 42 L.Ed.2d 112 (1974); *Encyclopedia Britannica, supra* at 12. Section 4(5) was aimed directly at the type of limitation inserted in the bill of lading by Shulman. The $500 limit represents a binding allocation of risks between the carrier and shipper, one that cannot be reduced by contractual agreement.[8]

Section 4(5) is buttressed by § 3(8), 46 U.S.C. § 1303(8), precluding various clauses in bills of lading which would limit a carrier's liability. Courts have used this provision to invalidate various clauses in bills of lading which had the effect of relieving a carrier from liability. *See, e. g., United States v. Atlantic Mutual Insurance Co., supra* (holding invalid a "both-to-blame" clause, applying where two ships collided, both were at fault, and cargo was damaged; if recovery was made against a non-carrying ship, the clause required a portion of the recovery to be paid to the carrying vessel); *Encyclopaedia Britannica, supra* (holding invalid a clause which gave carrier option to carry goods above deck, thus exempting it from COGSA, but did not disclose how the option would be exercised); *Pan-Am Trade & Credit Corp. v. The Campfire, supra* (holding invalid a "pro-rata" clause which limited recovery to the same percentage of the valuation as the percentage of the damage was to the actual damage); *Otis McAllister & Co. v. Skibs,* 260 F.2d 181 (9th Cir. 1958) (holding invalid an "invoice valuation" clause which limited recovery to the invoice value rather than the value the goods would have had on arrival). The rationale behind such decisions was stated by the Second Circuit:

"The shipowners stress the consensual nature of the clause, arguing that a bill of lading is but a contract. But that is so at most in name only; the clause, as we are told, is now in practically all bills of lading issued by steamship companies doing business to and from the United States. Obviously the individual shipper has no opportunity to repudiate the document agreed upon by the trade, even if he has actually examined it and all of its twenty eight lengthy paragraphs, of which this clause is No. 9. This lack of equality of bargaining power has long been recognized in our law; and stipulations for unreasonable exemption of the carrier have not been allowed to stand." *United States v. Farr Sugar Corp.,* 191 F.2d 370, 374 (2d Cir. 1951), *aff'd sub nom., United States v. Atlantic Mutual Insurance Co., supra.*

If the clause here limiting Shulman's liability to $50 per shipment were to stand, similar clauses would soon find their way into other carriers' bills of lading. While there may not be actual disparity of bargaining power between large shippers and large carriers, "[t]he bill of lading is usually a boilerplate form drafted by the carrier, and presented for acceptance as a matter of routine business practice to a relatively low-level shipper employee". *Pan American World Airways, Inc. v. California Stevedore and Ballast Company,* 559 F.2d 1173, 1177 (9th Cir. 1977). Little opportunity exists to negotiate away this type of clause, especially since such a clause would not be expected under the uniform rules which COGSA pro-

---

**8.** The amount of liability may be increased under § 4(5):

"COGSA allows a freedom of contracting out of its terms, but only in the direction of *increasing* the shipowner's liabilities, never in the direction of diminishing them." (footnote omitted) Gilmore & Black, *The Law of Admiralty* 125 (1957).

*See Encyclopedia Britannica, supra* at 12.

74**

vides. The presence of such a clause would have the effect of destroying the uniformity of bills of lading upon which their free negotiability depends, in contravention of an express purpose of COGSA.

The amount to which Shulman has attempted to limit its liability, $50 per *shipment,* is so low as to offend public policy. Shulman's $50 per shipment limit would apply to any shipment from a carton of nails to a shipload of computers. The potential liability of Shulman is so small as to almost completely exempt it from liability. In *David Crystal, Inc. v. Cunard Steam-Ship Co.,* 339 F.2d 295, 299 (2d Cir. 1964), in a case involving goods damaged after arrival, the court determined that a £20 per *package* limitation, "when contrasted with COGSA's $500 figure, is such an arbitrarily small sum that it should be void as contrary to public policy". Similar reasoning was applied in a recent District of Puerto Rico case under the Harter Act. In holding invalid a $50 per *shipment* limitation of liability clause as against public policy, Chief Judge Toledo stated:

> "[T]he instant clause is an unreasonable and unfair limitation more unto an absolute disclaimer of liability. The valuation represents so small an amount it is a mere token and public policy cannot sanction it. The disparity is too great to be lightly overlooked and the limit is so low as to be entirely illusory when contrasted even with the $500-per-package limitation of COGSA as interpreted by this court to cover one trailer unit." (citations omitted) *Federal Insurance Company v. Transconex, Inc.,* 430 F.Supp. 290, 295 (D.P.R.1976).

▋ The filing of Shulman's "Rules and Regulations—FMC–F–No. 1" with the FMC does not give support to Shulman's position. The Shipping Act, 46 U.S.C. § 801 *et seq.,* requires carriers to file their tariffs with the FMC. The Shipping Act provides:

> "Every common carrier by water in interstate commerce shall establish, observe, and enforce just and reasonable . . . tariffs, and just and reasonable regulations and practices relating thereto and to the issuance, form and substance of . . . bills of lading. . . .
>
> \* \* \* \* \* \*
>
> Whenever the Commission [FMC] finds that any . . . tariff, regulation, or practice . . . is unjust or unreasonable, it may determine, prescribe, and order enforced . . . a just and reasonable classification, tariff, regulation, or practice." 46 U.S.C. § 817(a).[9]

The purpose of such filing is to allow the FMC to regulate the rates charged in interstate shipping, to prevent discrimination, and to provide formal notice to shippers regarding rates so that carriers can utilize short-form bills of lading.

▋ While the FMC may find such rules and regulations unreasonable, there is no evidence that the mere filing of the rules and regulations by a carrier creates a presumption that the FMC has found that the rules and regulations are reasonable. The district court did assume as true the representation by the appellant that the $50 limitation clause was approved by the FMC. However, the district court quite properly went on to determine that "[n]otwithstanding, an administrative agency has only such powers as may have been conferred upon it by law, and such an agency must act within the granted authority for an authorized purpose". App. 19. The FMC has no power to approve a regulation of a carrier which is contrary to the statutory requirements mandated by Congress in COGSA and the public policy against a carrier exempting itself from liability.

---

**9.** Carriers by water in foreign commerce are required to file their tariffs with the FMC, but there is no requirement that the tariffs be just and reasonable. 46 U.S.C. § 817(b)(1).

However, the carriers in foreign commerce cannot charge a rate different from the tariff that is on file with the FMC, 46 U.S.C. § 817(b)(3), and the rate cannot "be so unreasonably high or low as to be detrimental to the commerce of the United States". 46 U.S.C. § 817(b)(5).

Finally, we come to the question of the proper valuation under COGSA. The press was shipped "in open view, unboxed, was not wrapped or crated, and did not have any type of shipping skids". App. 18. As such, it was not a package as defined by COGSA.[10] The statutory alternative ("in case of goods not shipped in packages, per customary freight unit") is equally inapplicable. For goods not shipped in packages, the maximum liability is $500 per customary shipping unit. 46 U.S.C. § 1304(5). The shipping unit here was the cubic foot. As declared in the bill of lading, charges were based on 594 cubic feet at a rate of $.91 per cubic foot for a total of $540.54. App. 15. We have not been presented with any proof or argument as to what, if anything, was "customary". If the maximum liability here were to be 594 (customary shipping units) multiplied by $500 (for each shipping unit)—a total of $297,000—the court would reject this amount on an *ad absurdum* basis, and such an amount would be in contravention of COGSA's clause "[i]n no event shall the carrier be liable for more than the amount of damages actually sustained". 46 U.S.C. § 1304(5). Thus, the trial court correctly held that Shulman was liable for the actual damages suffered by Hanover.

Accordingly, the judgment in the amount of $8,346.62 is *affirmed*.

---

10. *Compare, e. g., General Motors Corp. v. Moore-McCormack Lines, Inc.,* 451 F.2d 24 (2d Cir. 1971) (per curiam) (electric generator shipped without box or crate was not a package) and *Petition of Isbrandtsen Company,* 201 F.2d 281 (2d Cir. 1953) (uncrated locomotive was not a package), with *Aluminios Pozuelo, Ltd. v. S.S. Navigator,* 407 F.2d 152 (2d Cir. 1968) (toggle press bolted to a skid was a package because the shipper had so declared).