**POLYPLASTICS, INC.,**
**Plaintiff, Appellee,**

v.

**TRANSCONEX, INC.,**
**Defendant, Appellant.**

No. 87–1134.

United States Court of Appeals,
First Circuit.

Heard July 31, 1987.
Decided Sept. 3, 1987.

860

Fernando Castro with whom Roberto Boneta and Trias, Doval, Munoz, Acevedo & Otero, Hato Rey, P.R., were on brief, for appellant.

Edelmiro Salas Garcia, Santurce, P.R., for appellee.

Before BOWNES, TORRUELLA and SELYA, Circuit Judges.

SELYA, Circuit Judge.

Transconex, Inc. (Transconex), defendant/appellant, is a so-called non-vessel-operating common carrier (NVOCC), which does business essentially as a freight forwarder. In the usual course, an NVOCC assembles small lots into a single large container at a determinate point of origin for shipment and handling by an ocean carrier to a specified destination. The freight forwarder arranges for the bulk load to be broken down dock-side or moved inland to a dispersal point, as circumstances warrant. In either event, the container is unloaded by the NVOCC's agents or contractors, and the goods delivered to the individual consignees. As a freight forwarder, an NVOCC is considered the "carrier." See 49 U.S.C. § 11707(a)(2); see also Fireman's Fund American Insurance Companies v. Puerto Rican Forwarding Co., 492 F.2d 1294, 1295 (1st Cir. 1974). Vis-a-vis the owner, the forwarder retains primary responsibility for carriage of the goods from origin to destination (both by water and by land).

In December 1980, Polyplastics, Inc. (Polyplastics), plaintiff/appellee, purchased a used trailer from Fruehauf Corporation (Fruehauf). Faced with the necessity of bringing its acquisition from Fruehauf's yard in Miami, Florida to Polyplastics's plant in Humacao, Puerto Rico, the appellee sought Transconex's assistance. Transconex made Polyplastics's problem its own, and agreed to deliver the trailer—which it promptly lost. Polyplastics duly tendered claim against Transconex. The latter steadfastly refused to pay what the appellee thought its trailer was worth. Polyplastics sued. The case was tried jury-waived. The district court found for the plaintiff in an amount equal to the price which Fruehauf charged Polyplastics for the trailer. Transconex appealed.

■ Following a bench trial, we can disturb the findings of the court only if clearly erroneous or contrary to law. Fed.R. Civ.P. 52(a). And, we need not limit ourselves to the exact grounds for decision utilized below. We are free, on appeal, to

affirm a judgment on any independently sufficient ground. *Chongris v. Board of Appeals,* 811 F.2d 36, 37 n. 1 (1st Cir.), *cert. denied,* — U.S. —, 107 S.Ct. 3266, 97 L.Ed.2d 765 (1987); *Casagrande v. Agoritsas,* 748 F.2d 47, 48 n. 1 (1st Cir. 1984) (per curiam). A review of the (rather scanty) evidence in this case persuades us that we hold no brief to disturb the verdict.

There were but two witnesses at the trial: Gabriel Espases, president of Polyplastics, and Rafael Catinchi, a Transconex executive. The underlying facts are largely undisputed. The trailer was at Fruehauf's yard in Miami and Polyplastics wanted it moved to Humacao. Therefore, Espases called Transconex to make shipping arrangements. He was quoted two prices for transportation. One—presumably the scheduled rate—was in excess of $2500. The second was a special rate negotiated between the parties which contemplated allowing appellant to treat the trailer not as ordinary freight, but to use it as a shipping container for transporting other wares. The parties settled on the double-duty arrangement and on a flat fee of $500.

Transconex then wrote up the paperwork unilaterally in the traffic department of its Miami office. It chose not to complete much of the cargo-specific information on its own form, leaving the boxes for such data as "rate," "measurements," and "weight" untouched. Catinchi specifically denied that his firm acted as the plaintiff's agent in inscribing and processing the bills of lading and other documents. Supplemental Record Appendix (SRA) at 37. No value was stated for the trailer; indeed, the applicable boxes on the bill of lading form—"FOB Value," "Insured Value," etc. —were left blank. No documents were signed by Polyplastics; in particular, Transconex's standard instruction form (Exhibit B), which is designed for the joint signatures of the owner and the carrier, was neither filled out nor presented to the appellee for execution. Catinchi testified that, if his company's customary practice was followed, a duplicate original of Exhibit A (the bill of lading upon which Transconex relies) would have been mailed from Miami to the plaintiff's offices in Puerto Rico. SRA at 26. There was no evidence, however, that Polyplastics ever received it.[1]

Appellant took possession of the trailer in Miami, crammed it full of goods belonging to Transconex's other customers, and stowed it aboard the Fortaleza. The vessel arrived in San Juan without untoward incident on or about December 18, 1980. The trailer was received dock-side by PRCS and taken to a distribution point. The merchandise was thereafter unloaded. Overnight, while in appellant's custody and control, the trailer mysteriously disappeared. Transconex nevertheless submitted an unitemized "miscellaneous" invoice (Exhibit 5) in the amount of the agreed fee.

Based on these facts, the plaintiff adopted a classically simple position. Absent some statutory or contractual protection indigenous to the transaction, a carrier has an unflagging duty to keep, transport, and handle safely goods entrusted to its care. *See, e.g., Propeller Niagara v. Cordes,* 62 U.S. (21 How.) 7, 23–26, 16 L.Ed. 41 (1859) (likening carrier's burden to that of an insurer). Transconex breached this obligation, the plaintiff averred, and should be held accountable for the loss of the rig. The appellant agrees in part; it acknowledges the duty and the breach, but claims that a special circumstance—a $50 per shipment limit of liability contained in its form bill of lading—caps its exposure. And, it asseverates, the district court erred in entering judgment in a greater amount.

The district judge refused to honor the $50 limitation. In effect, though the ceiling appeared in the appellant's general tariff and the preprinted bill of lading which Transconex chose to employ, the judge held the restriction unenforceable under both

---

1. The inference is to the contrary, as Espases produced only one bill of lading from the plaintiff's file, Exhibit 2, which was a copy of a bill of lading between Transconex and Puerto Rico Cargo Services, Inc. (PRCS), an affiliate of the appellant. (PRCS received the full trailer in San Juan, Puerto Rico when the ocean freighter, the Fortaleza, docked.) The point is largely academic: even if Exhibit A was mailed to Polyplastics as Catinchi believed, it would have been received after shipment was underway.

our decision in *Hanover Insurance Co. v. Shulman Transport Enterprises, Inc.*, 581 F.2d 268 (1st Cir.1978), and the district court's own pre-*Hanover* precedent. *E.g., Federal Insurance Co. v. Transconex, Inc.*, 430 F.Supp. 290 (D.P.R.1976). Appellant points out—correctly—that there are notable differences between this case and those precedents. Those differences, Transconex urges, demand an opposite result. We need not assay the nature or worth of the claimed distinctions, however, for we find that—for reasons entirely independent of the rationale which undergirds *Hanover* and *Federal Insurance* [2]—Transconex's liability limit is inapplicable in this one-of-a-kind instance.

We reflect briefly on the legal standards applicable to such agreed-value limitations. In the absence of statute:

> ... [I]t has been declared to be the settled federal law that if a common carrier gives to a shipper the choice of two rates, the lower of them conditioned upon his agreeing to a stipulated valuation of his property in case of loss, even by the carrier's negligence, if the shipper makes such a choice, understandingly and freely, and names his valuation, he cannot thereafter recover more than the value which he thus places upon his property.

*Union Pacific R.R. Co. v. Burke*, 255 U.S. 317, 321, 41 S.Ct. 283, 284, 65 L.Ed. 656 (1921). In such circumstances, the agreed valuation is sustainable on principles of estoppel: "having accepted the benefit of the lower rate, in common honesty the shipper may not repudiate the conditions on which it was obtained." *Id. See also American Railway Express Co. v. Lindenburg*, 260 U.S. 584, 592, 43 S.Ct. 206, 209, 67 L.Ed. 414 (1923) (similar). Put yet another way:

Neither is it conformable to plain principles of justice that a shipper may understate the value of his property for the purpose of reducing the rate, and then recover a larger value in case of loss. *Adams Express Co. v. Croninger*, 226 U.S. 491, 510, 33 S.Ct. 148, 154, 57 L.Ed. 314 (1913).

Transconex contends that its $50 limitation slips neatly within this integument. After all, its preprinted form bill of lading provides for an agreed valuation of $50 per shipment "... unless a greater value is declared at the time of shipment and an additional charge of 1% thereof paid...." Transconex's filed tariff was in harmony with this clause. And, as remarked before, the boxes provided for declarations of value, *see supra* at 861, were left pristine when the appellant's crew prepared the documentation. Yet, this argument entirely misses the point.

■ The law in this area has been well settled for many decades. In the usual case, transport companies fashion a schedule of charges dependent, at least in part, "upon the value of the property carried." *Adams Express*, 226 U.S. at 512, 33 S.Ct. at 154. When goods are consigned for shipment without special arrangements, and a scheduled rate charged for the package, then it may fairly be assumed that the parties should have known there was an interrelationship between the rate and the declared valuation. Once "[h]aving accepted the benefit of the lower rate dependent upon the specified valuation, the [shipper] is estopped from asserting a higher value," *American Railway Express Co.*, 260 U.S. at 592, 43 S.Ct. at 209, and the agreed valuation governs in the event of ensuing loss. *See Boston & Maine R.R. v. Piper*, 246 U.S. 439, 444, 38 S.Ct. 354, 355, 62

---

**2.** In *Hanover*, we held a $50 per shipment limitation clause invalid under the Carriage of Goods by Sea Act (COGSA), 46 U.S.C. §§ 1300 *et seq.* In *Federal Insurance*, the district court invalidated a similar stipulation under the Harter Act, 46 U.S.C. § 190. Both *Hanover*, 581 F.2d at 272–74, and *Federal Insurance*, 430 F.Supp. at 294–96, drew sustenance from the fact that the supposed liability ceiling was "so low as to be entirely illusory." *Federal Insur-*

*ance*, 430 F.Supp. at 295, quoted with approval in *Hanover*, 581 F.2d at 274. This circumstance was, in each case, fortified by the unavailability of an alternate *ad valorem* freight rate. *E.g., Federal Insurance*, 430 F.Supp. at 295–96. In addition, COGSA—which the parties concede has no applicability to the case at bar—contained its own built-in minimum level of valuation, 46 U.S.C. § 1304(5).

L.Ed. 820 (1918). In effect, the law recognizes that:

> ... [A] carrier might fix his charges somewhat in proportion to the value of the property.... The principle is that the charge should bear some reasonable relation to the responsibility, and that the care to be exercised shall be in some degree measured by the bulk, weight, character and value of the property carried.

*Adams Express*, 226 U.S. at 510, 33 S.Ct. at 153. In such circumstances, the enforceability of the limitation clause depends on the sort of criteria discussed by the *Federal Insurance* court. 430 F.Supp. at 294–97.[3] But, this case is materially different.

When Espases called the appellant, he was quoted a rate to transport the trailer "as a regular cargo, empty." SRA at 4. He was simultaneously offered a special arrangement—an arrangement having nothing at all to do with "regular cargo" charges. The offer departed from the scheduled rates, eschewed the filed tariff, and was quoted without regard to the size, weight, or value of the trailer. As Espases described it:

> THE WITNESS: .... [T]he [special] arrangement was for them to use the trailer, load it with their merchandise and utilize it to carry their merchandise to Puerto Rico and then deliver the trailer for the price of $500
>
> THE COURT: For the flat rate of $500?
>
> THE WITNESS: Yes, because that gave them the right to utilize the trailer. They would pick up the trailer at Fruehauf and deliver it to our door in Humacao.

SRA at 4. This testimony was not disputed by Catinchi. There was no discussion at all of the trailer's replacement cost or market value, and not the smallest indication that such factors played any role in the fee calculus. The trade-off here was not a

lower rate for a lesser declared value; it was a lower rate for a special consideration: the right to temporary use of the chattel.

Where, as here, the rate bears no relationship to the valuation of the goods, the rule is materially different. In *Toyo Kisen Kabushiki Kaisha v. Willits & Co.*, 17 F.2d 762 (9th Cir.1927), the court refused to enforce a cap solely because the carrier had not shown any nexus between the freight rate and the limitation on value. *Id.* at 763–64. The court declared that "[u]nder such facts the limiting clause was not binding on the shipper." *Id.* at 764. The governing proposition was nicely stated in *A.C. Lawrence Leather Co. v. Compagnie Generale Transatlantique*, 12 F.2d 83 (S.D.N.Y.1926), *aff'd*, 18 F.2d 930 (2d Cir.), *cert. denied*, 274 U.S. 761, 47 S.Ct. 770, 71 L.Ed. 1338 (1927):

> The ... authorities clearly indicate that the limitation of liability by carriers to the amount of a stipulated valuation will only be sustained in cases in which a choice of rates has been given to a shipper *and the limitation actually has been made the basis of a reduced rate.*

12 F.2d at 85 (emphasis supplied).

These teachings inform the case at bar. Polyplastics and Transconex, in this instance, were not aligned in a traditional shipper/carrier juxtaposition. Theirs was a barter arrangement pure and simple, a trade which balanced the plaintiff's need to transport the trailer against the extrinsic benefit which the defendant stood to gain by using it as a shipping container. Though the evidence shows that Transconex offered Polyplastics a choice between two rates, the lower of them was in no way "conditioned upon [Polyplastics] agreeing to a stipulated valuation of [its] property in case of loss." *Union Pacific R.R. Co.*, 255 U.S. at 321, 41 S.Ct. at 284. Rather, the variable which dictated the fluctuation in

---

3. We recognize that Transconex, as the losing party in *Federal Insurance*, has made demonstrable efforts to overcome the deficiencies in its documentary armamentarium perceived by the *Federal Insurance* court. We leave for another day the question of whether these efforts have sufficed to render the $50 per shipment limitation impervious to attack in a garden-variety commercial transaction. This case turns wholly on an idiocratic set of facts not likely to arise again, and is neither precedent for, nor governed by, the rules which apply in the conventional shipper/carrier setting.

rates was the shipper's willingness (or not) to spare the forwarder from containerization costs by allowing the Fruehauf trailer to do double duty. Keeping the setting in mind, it seems clear that the flat fee would have been the same irrespective of what Polyplastics paid for the trailer, believed its intrinsic worth to be, or claimed as its valuation. That is to say, the value *per se* of the rig was only of incidental interest to the parties, given the custom-tailored contours of their deal—so incidental that they neglected even to mention it.

The proof at trial entirely failed to show that the limitation on liability which Transconex now seeks to enforce was factored into a price adjustment. Inasmuch as there was absolutely no relationship between the declared value of the trailer—or, more precisely put, the lack of any such declared value—and the rate charged for shipment, the limiting clause was not called into play. At the bottom line, the limitation was not "the basis of a reduced rate". *Lawrence Leather*, 12 F.2d at 85.[4]

In fine, this is not a "shipping document" case at all. It is a suit over a *sui generis* contract—a contract which the appellant acknowledges that it broke by failing to redeliver the trailer in good condition (or at all, for that matter). Transconex's counsel admitted at oral argument that the defendant, having failed in its undertaking, was liable. The sole dispute, as he put it, was as to amount: $50 if the limitation was alive and well, the actual value of the trailer if the limitation was moribund. As can be seen from our autopsy of the appellant's points, rigor mortis has set in. Accordingly, the judgment of the district court must be

*Affirmed.*

---

**4.** The appellant has devoted much of its brief on appeal to an analysis of the effect of the Interstate Commerce Commission's approval of certain of its tariffs. *See* I.C.C. Released Rates Decision No. FF–305 (April 22, 1983). We decline to enter that swamp for two reasons. First, the issue was not raised below until after trial, verdict, and entry of judgment. The district court was well within its discretion in refusing to consider so tardy a proffer. *See, e.g., Pagan v. American Airlines, Inc.*, 534 F.2d 990, 992–93 (1st Cir.1976). Second, as mentioned in the text, we do not purport to pass upon the validity of Transconex's regular rates or its agreed-value limitation. Instead, we regard them as irrelevant to the *sui generis* contract which the parties crafted in this instance. Thus, the I.C.C. materials are equally irrelevant.