GRANITE STATE INSURANCE
COMPANY, Plaintiff,

v.

M/V CARAIBE, her engines, boilers, tackles, apparels, appurtenances, etc.; Hapag–Lloyd AG; John Doe; Richard Roe; X, Y and Z Insurance Companies, Defendants.

Civ. No. 92–2000 (JAF).

United States District Court,
D. Puerto Rico.

June 23, 1993.

Darío Rivera–Carrasquillo, Cordero, Miranda & Pinto, San Juan, P.R., for plaintiff.

.J. Ramón Rivera–Morales, Jimenez, Graffam & Lausell, San Juan, P.R., for defendants.

## OPINION AND ORDER

FUSTE, Judge.

Plaintiff insurer has instigated a suit against the M/V CARAIBE, *in rem*, and the shipowner, Hapag–Lloyd AG, *in personam*, for the value of cargo damaged while allegedly in the care and custody of the carrier. The subrogated cargo insurer has already fully compensated the insured shipper for the damage, and now the insurer seeks to collect through subrogation an equivalent amount in money damages from defendants. The insurer has moved for partial summary judgment to strike an affirmative defense presented by defendants regarding a $500–per–package or customary-freight-unit limitation on liability for damage to the cargo in question. Defendants, correspondingly, have submitted a cross-motion for partial summary judgment, claiming their liability is expressly limited to $500 per package or customary freight unit by statute as set forth in the shipment's bill of lading. The parties agreed in a pretrial conference held on April 2, 1993, that there is no factual dispute that affects the disposition of these motions for Rule 56 relief. *See Pretrial Conference Order*, Docket Document No. 15. We now **grant** defendants' motion for partial summary judgment and **deny** plaintiff's motion.

## I.

### *Facts*

At the port of Ponce, Puerto Rico, on or about August 15, 1991, defendant sea carrier Hapag–Lloyd AG ("Hapag–Lloyd"), a Carol Lines participating carrier, acting through an agent, Luis A. Ayala Colón Sucrs., Inc. ("Ayacol"), accepted from the shipper's agent, Air Sea Forwarder's, Inc. ("Air Sea Forwarder's"), three containers with cargo to be transported by sea to the port at Felixstowe, England: One twenty-foot container and two forty-foot trailers. The shipper was Wahlco Inc. ("Wahlco"), a Santa Ana, California, concern, and the receiver was Pentol of UK ("Pentol"), an English corporation. The shipper's insurer, plaintiff in this case, was Granite State Insurance Company ("Granite"). For simplicity, other defendants including the vessel and Hapag–Lloyd's insurer are meant to be implicitly included in our references to defendant Hapag–Lloyd.

The three containers at issue were filled with machinery and parts constituting one "SO3 Flue Gas Conditioning Equipment." (*Hapag–Lloyd Bill of Lading No. AYLA FLX 91–621*, Docket Document No. 8, Appendix). More specifically, the first container, a forty-foot flat rack, identified as HARU 4650434, encompassed two sizable control panels constituting one system skid assembly. The second container, HLCU 4680690, included eight smaller crated parcels. And the third, identified as HLCU 293600, was a twenty-foot closed container holding spare parts and other miscellaneous pieces of machinery. The total value of the cargo was $1,900,000 according to the shipper's invoice. (*See Wahlco Commercial Invoice*, Docket Document No. 8, Appendix). Wahlco's insurance policy with Granite covered the cargo during sea transport up to a limit of $300,000/$3,000,000, depending on the freight method. (*See Granite State Insurance Company Policy No. 24–60458*, Docket Document No. 6, Exhibit I, at 1).

The payload triad, "received in apparent visual ... good order and condition on its outer coverings and wrappings," was placed aboard the vessel M/V CARAIBE at the port at Ponce under bill of lading No. AYLA FLX 91–621. (*See Pretrial Order*, Docket Docu-

ment No. 13, at 3). The bill of lading did not set forth a valuation of the cargo or the cargo's specific contents. *See id.* at 4. The shipment arrived at its intended port, Felixstowe, on August 26, 1991, and was delivered to Pentol in Kent, England, on September 11, 1991. *See id.* at 3. The containers and cargo were noticeably damaged upon arrival according to plaintiff. *See id.* at 2. The materials were unsealed or inspected and found to be in a seriously damaged condition—in the amount of $184,800. Granite paid the insured for the loss, thus becoming subrogated to the shipper's rights and claims. (*See Subrogation Receipt* and *American International Underwriters Check to Wahlco, Inc.*, Docket Document No. 6, Exhibits IV and V). Granite now sues[1] the various defendants ("Hapag–Lloyd") for the $184,800 in damages to the cargo. (*See Complaint*, Docket Document No. 1). The ultimate cause, time, and place of damage are not at issue in answering the particular legal questions requisite to disposing of these partial summary judgment motions.

The cargo's bill of lading, the contract setting forth the details of the sea transportation agreement between Wahlco and Hapag–Lloyd through their respective agents, however, rests at the heart of this controversy and its resolution. The bill of lading for the instant cargo did *not* declare any value for the cargo, *nor* did it specify the particulars of the shipped materials. The only information presented in the bill of lading besides the names and addresses of involved parties is a listing of the three container numbers, general descriptions of each container, the freight cost methodology, and the total cost of shipment, all appearing in the box on the face of the bill of lading labelled "ABOVE PARTICULARS AS DECLARED BY SHIPPER." (*See Hapag–Lloyd Bill of Lading No. AYLA FLX 91–621*, Docket Document No. 8, Appendix). Container Numbers HARU 4650434, HLCU 4680690, and HLCU 2936000 are described as "2 × 40'

FLAT CONTAINERS & 1 × 20' CONTAINER" with gross weight of "71,188 LBS." or "35,012 KGS." *Id.* The bill of lading also states that the shipment is "2 SYSTEMS SKID ASSEMBLY, 6 PCS. HARDWARE AND PARTS, PROBES AND STABILIZERS." *Id.* The freight is marked prepaid for a total of $8,822.04, a sum figured from the following charges as quoted from the bill of lading:

$3,400.00—O.F. PER EA. 40' FLAT CONT.

175.00—BUNKER CHARGE PER EA. 40' FLAT CONT.

149.00—O.F. PER CBM. (4.99 CBM.) 20'

53.00—SHORTFALL PER CBM. (16.01 CBM.) 20'

80.00—BUNKER CHARGE PER 20' CONT.

*Id.*

The reverse side of the bill of lading explains various standard legal rights and responsibilities involving the shipment, including a "clause paramount" incorporating the U.S.–Carriage of Goods By Sea Act of 1936 ("COGSA"), 46 U.S.C.App. § 1300 *et seq.*, and related valuation and liability limitation requirements. (*See generally Clause 7, Sundry Liability Provisions, Hapag–Lloyd Bill of Lading No. AYLA FLX 91–621*, Docket Document No. 8, Appendix). Clause 12(3) of the bill of lading states that "[t]he Merchant [or shipper] acknowledges that, except where the provisions of clause 7(3) apply, the value of the Goods is unknown to the Carrier." Clause 7(3) of the bill declares that the only manner in which the carrier can know the value of the cargo, and becomes liable for the full value of it, is when the shipper states the valuation information on the *face* of the bill of lading:

The merchant [or shipper] agrees and acknowledges that the Carrier has no

---

1. [Shipper] may procure an "all risk" policy, at a correspondingly higher premium.... [Regular] cargo insurance, of course, insures against some losses for which the ship is responsible.... It is greatly to the advantage of cargo to be able to look to the underwriter instead of the carrier for payment.... [T]he operation of

the doctrine of subrogation is such that a carrier often finds itself sued, in the name of the shipper, by the insurance company that has already reimbursed the shipper for the loss[.] Grant Gilmore and Charles L. Black, Jr., *The Law of Admiralty* § 3–47 at 190 (2d ed. 1975).

knowledge of the value of the Goods, and that higher compensation than that provided above [under the U.S.–Carriage of Goods By Sea Act of 1936 ("COGSA") ] may not be claimed unless, with the consent of the Carrier, the value of the Goods declared by the Shipper prior to the commencement of Carriage is stated *on this Bill of Lading and extra Freight paid.* If required in that case, the amount of the declared value shall be substituted for the limits laid down above [in clause 7(2), namely COGSA's $500 per package or customary freight unit]. Any partial loss or damage shall be adjusted pro rata on the basis of such declared value.

(*See Clause 7(3) Hapag–Lloyd Bill of Lading No. AYLA FLX 91–621,* Docket Document No. 8, Appendix) (emphasis added). According to Hapag–Lloyd and the bill of lading, the shipper could have increased the carrier's liability by declaring a value of the cargo above $500 per package or customary freight unit ("CFU"). By doing so, however, the shipper would have been required to pay a significantly higher freight charge in exchange for the increase in liability assumed by the carrier. (*See Tariff: Ad Valorem Rates—Declaration of Value on Bills of Lading,* FMC 13, Sept. 5, 1985, Rule 12, Docket Document No. 9, Appendix). Shipper Wahlco had procured a comprehensive insurance policy through plaintiff Granite to cover the cargo to be shipped by Hapag–Lloyd.

## II.

### Issue

The knot this court has been asked to unravel stems from a clash of legal theories regarding cargo damage liability. Most importantly, we must decide whether the COGSA $500–per–package or customary-freight-unit liability limitation provisions, expressly stated on the reverse side of the bill of lading, apply to the Wahlco cargo or whether the carrier is liable for a much larger sum: The actual value of the damages suffered. In order to answer the COGSA question, plaintiff insurer has asked the court to con-

sider whether the bill of lading lacked a clearly marked space for the shipper to declare the cargo's actual or market value. If a clearly marked value-declaration space was not provided on the face of the bill of lading, plaintiff argues that the shipper was deprived of a fair opportunity to put the sea carrier on notice of the value of the shipment and, therefore, of the carrier's exposure to liability above the COGSA limitation level. If, on the other hand, the COGSA limitation applies, and its appearance in the bill of lading is prima facie evidence of the shipper's fair opportunity to declare a higher value, we must decide what constitutes a "package" or "customary freight unit" so that we may calculate the carrier's potential liability. *See* 46 U.S.C.App. § 1304(5) (statutory liability limitation explained).

## III.

### Standard for Summary Judgment

■ Federal Rule of Civil Procedure 56(c) states that summary judgment "shall be rendered forthwith if the pleadings, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). *See Anderson v. Liberty Lobby Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *Garside v. Osco Drug, Inc.,* 976 F.2d 77, 78 (1st Cir.1992). In all of the court's considerations in deciding a summary judgment motion, the court must consider the record in the light most favorable to the non-moving party. *Bank One Texas, N.A. v. A.J. Warehouse, Inc.,* 968 F.2d 94, 97 (1st Cir.1992).

We note that the propriety of disposing of this portion of the case under Rule 56 is not in question. The parties have stipulated that there is no genuine dispute of material fact. Therefore, we move immediately to a discussion of the law of COGSA and cargo carrier liability.

## IV.

### COGSA Background [2]

Early common law considered sea cargo carriers as virtual insurers for the safe delivery of goods. *See* Thomas J. Schoenbaum, *Admiralty and Maritime Law* § 9–7 at 294 (practitioner's ed. 1987). In the nineteenth century, sea carriers developed contractual means to relieve them from liability for damaged cargo; however, the validity of such contractual clauses was challenged both in courts and legislatures, resulting in a confused state of carrier liability law. *Id.* International bodies delved into the problem, eventually enacting in 1924 a standard set of liabilities and responsibilities of carriers and shippers: The International Convention for the Unification of Certain Rules of Law relating to Bills of Lading ("the Hague Rules"). *Id.* Amendments to the Hague Rules and other international and national agreements have been adopted since the early twentieth century, but we are particularly concerned here with the domestic codification of the Hague Rules by the United States in the Carriage of Goods by Sea Act of 1936 ("COGSA"), 46 U.S.C.App. § 1300 *et seq.* (a statute inter alia limiting carrier liability in certain circumstances to $500 per package or customary freight unit). *See* Thomas J. Schoenbaum, *Admiralty and Maritime Law* § 9–13 at 314–15 (practitioner's ed. 1987).

The language of "COGSA ... 'was lifted almost bodily from the Hague Rules.... The effort of those Rules was to establish uniform ocean bills of lading to govern the rights and liabilities of carriers and shippers Inter se in international trade.'" *Hanover Ins. Co. v. Shulman Transport Enterprises, Inc.*, 581 F.2d 268, 271 (1st Cir.1978) (quoting

*Robert C. Herd & Co., Inc. v. Krawill Machinery Corp.*, 359 U.S. 297, 79 S.Ct. 766, 3 L.Ed.2d 820 (1959)).[3]

COGSA established a framework within which carriers and shippers worldwide can operate with a high degree of certainty as to the responsibility of the parties. "COGSA thus settle[d] the important terms and the rights and duties of the parties. Bills of lading typically contain a 'clause paramount'[4] expressly incorporating COGSA.... [It should be noted that] [c]ontracts of carriage between ports of the United States and inland water carriage under bills of lading are governed by the Harter Act [of 1893]." Thomas J. Schoenbaum, *Admiralty and Maritime Law* § 9–13 at 316 (practitioner's ed. 1987); *see also* 46 U.S.C.App. § 190 *et seq.* (The Harter Act). While these legislative actions have provided more uniformity to the legal landscape of sea carrier insurance and cargo liability, United States federal courts have not harmoniously interpreted COGSA's liability limitation provisions, thereby detracting from the original and laudable purpose of the Act. *See* Charles L. Black, Jr., *The Bremen, Cogsa, and the Problem of Conflicting Interpretation*, 6 *Vand. J. Transnat'l L.* 363 (1973). Yet, more and more jurisdictions are converging on a common interpretation of COGSA law.

## V.

### Discussion: Fair Opportunity to Avoid COGSA Liability Limitation

COGSA is silent as to whether bills of lading that invoke the provisions of the sea carriage statute must contain on their face an

---

2. For an extended discussion of COGSA and its international corollaries, *see* Benjamin W. Yancey, *Admiralty Law Institute: Symposium on American and International Maritime Law: Comparative Aspects of Current Importance: The Carriage of Goods: Hague, COGSA; Visby, and Hamburg*, 57 Tul.L.Rev. 1238 (June 1983).

3. The First Circuit, in *Hanover Insur. Co.*, 581 F.2d at 270–73, provides an interesting and thorough analysis of the legislative history of the Harter Act, 46 U.S.C.App. § 190 *et seq.*, the Hague Rules, and COGSA.

4. Cogsa ... requires that an outbound bill of lading contain a "clause paramount," reciting

that the bill is to be governed by the provisions of the Act. This was an addition by Congress to the [Hague] Rules. No provision is to be found for enforcing this requirement. It has been suggested that the carrier who issued a bill without the clause paramount might be deprived of the protection of the Act and his bill of lading contract, rendered "illegal" by this omission, and be held to perform the contract of carriage on the "insured" basis of the common law.

Grant Gilmore and Charles L. Black, Jr., *The Law of Admiralty* § 3–44 at 185 (2d ed.1975) (citations omitted).

explicit value-declaration space in order for the $500–per–container or CFU liability cap to apply. "The requirement is not found in COGSA; it is judicial encrustation, designed to avoid what courts felt were harsh or unfair results." *Carman Tool & Abrasives, Inc. v. Evergreen Lines,* 871 F.2d 897, 899 (9th Cir. 1989). The text of COGSA reads that

[n]either the carrier nor the ship shall in any event be or become liable for any loss or damage to or in connection with the transportation of goods in an amount exceeding $500 per package lawful money of the United States, or in the case of goods not shipped in packages, per customary freight unit, or the equivalent of that sum in other currency, unless the nature and *value* of such goods have been declared by the shipper before shipment and *inserted into the bill of lading.*

46 U.S.C.App. § 1304(5) (emphasis added). Federal circuits have expressed divergent views as to whether the shipper has the responsibility to take positive actions to declare the actual value of its cargo or whether the carrier has a duty, in effect, to ask the shipper whether it wants to declare a higher value. The former view has been adopted by all but one of the circuits that have addressed this question. The latter perspective's sole adherent is the Ninth Circuit, but even the Ninth Circuit appears to be moving toward the Fifth Circuit's standard. *See Mori Seiki USA, Inc. v. M/V Alligator Triumph,* 990 F.2d 444, 448–49 (9th Cir.1993).

Both the plurality and minority views believe that a shipper must have a fair opportunity to declare a higher value or the actual value of the goods it entrusts to a carrier. Also both camps agree that in order to apply to a given shipment, the $500–per–package or CFU liability limitation provisions of COGSA must be incorporated into the language of the bill of lading:

Courts have developed two preconditions to invoking COGSA section 4(5)'s limitation on liability. First, the carrier must give the shipper adequate *notice* of the $500 limitation by including a 'clause paramount' in the bill of lading that expressly adopts the provisions of COGSA. Second, the carrier must give the shipper a *fair*

*opportunity* to avoid COGSA section 4(5)'s limitation by declaring excess value.

*Insurance Co. of North America v. M/V Ocean Lynx,* 901 F.2d 934, 939 (11th Cir. 1990) (citations omitted) (emphasis added). The notice provision is not particularly controversial given the widespread and common usage of COGSA clauses paramount. *See supra* n. 1. However, there has been a disagreement among the circuits centering on the practical requirements for "fair opportunity."

### A. Debate Among the Circuits

#### 1. The Ambiguous Minority View: The Ninth Circuit

"The Ninth Circuit has declared that a shipper will not be deemed to have knowledge of his opportunity to receive an alternative freight rate and higher carrier liability 'where such opportunity does not present itself *on the face of the bill of lading.*'" Thomas J. Schoenbaum, *Admiralty and Maritime Law* § 9–36 at 375 (practitioner's ed. 1987) (citing *Komatsu, Ltd. v. States S.S. Co.,* 674 F.2d 806, 810 (9th Cir.1982)) (emphasis added). The Ninth Circuit began to develop this perspective on the requirements of COGSA in its decision in *Tessler Bros. (B.C.), Ltd. v. Italpacific Line,* 494 F.2d 438, 443 (9th Cir.1974).

Three years later, the Ninth Circuit appeared to interpret both COGSA and the dictates of the Supreme Court to require an express option on the face of a bill of lading for the shipper to declare a higher value for the cargo in order to avoid COGSA's liability limitations. Thus, if the shipper forgoes the express option, COGSA's liability limitation becomes effective—whether the shipper is a novice or an expert:

[W]e reject [the] argument that an experienced shipper should be deemed to have knowledge of an opportunity to secure an alternative freight rate, and higher carrier liability, by reason of his knowledge of COGSA, 46 U.S.C.[App.] § 1304(5), made applicable by a 'Paramount Clause' in the bill of lading, where such opportunity does not present itself on the *face* of the bill of lading.

*Pan Am World Airways, Inc. v. California Stevedore & Ballast Co.,* 559 F.2d 1173, 1177

(9th Cir.1977) (emphasis added). The *Pan Am* decision has been upheld by succeeding panels of the circuit. *Accord Nemeth v. General S.S. Corp.*, 694 F.2d 609, 611 (9th Cir. 1982); *Komatsu, Ltd. v. States S.S. Co.*, 674 F.2d 806, 809 (9th Cir.1982).

However, defendants have brought to our attention a recent decision of the Ninth Circuit that distances itself from the requirement expressed by previous panels and interprets former Ninth Circuit decisions as *not* requiring a declaration space on the face of the bill of lading.[5] *See Mori Seiki USA, Inc. v. M/V Alligator Triumph*, 990 F.2d 444, 449 (9th Cir.1993). Specifically, the *Mori Seiki* court disavowed the notion that fair opportunity requires more than a *clear* and *readable* explanation or *quotation* of the COGSA limitation language in the bill of lading. *Id.* at 449.

After the *Mori Seiki* decision, the Ninth Circuit's standard for fair opportunity is unclear; however, the requirement may still include an expressly labelled, excess-value declaration "space" on the face of the bill of lading. Whether or not such a space is required by the Ninth Circuit, a shipper may choose to avoid COGSA's liability limitation by stating a value higher than the COGSA limitation on the face of the bill of lading. If the declaration space is indeed required, the shipper could transport cargo in the least expensive manner by leaving it blank.

### 2. *Plurality View: The Fifth Circuit Interpretation*

All of the other circuits that have navigated the waters of COGSA liability-limitation law, aside from the Ninth Circuit, have tacked a different course. Instead of following the Ninth Circuit's now questionable declaration-space requirement for bills of lading, the Fifth Circuit, Second Circuit, Fourth Circuit,[6] and Eleventh Circuit have interpreted COGSA's liability-limitation provisions to require a statement of incorporation of COGSA somewhere in the bill of lading, *i.e.*, the clause paramount discussed above. However, the plurality-view circuits do not oblige carriers to craft bills of lading with a special box for excess-value declaration. Thus, the plurality interpretation of COGSA's liability limitation provisions finds that the requirement of fair opportunity is satisfied by the informative language of the bill of lading. In light of the constructive notice of shippers' opportunity to declare a cargo value higher than $500 per package or CFU, silence on the shippers' part activates the default liability limitation of COGSA.

The Fifth Circuit has been the interpretational leader in developing this facet of COGSA law. In a case with a bill of lading and a COGSA clause paramount similar to those in the case in question, the Fifth Circuit asked,

> [w]ith COGSA so expressly adopted, what does COGSA provide? The answer is simple and direct: *$500 per package unless* the nature and *value* of the goods have been *declared by the shipper* and inserted in the bill of lading.... Next, and more significantly, the *published tariff* which has the effect of law very carefully *gave Shipper a choice* of valuations by a choice of precisely definable freight rates.

---

5. As noted above, the Ninth Circuit has expressed doubt as to the requirements for finding fair opportunity. This is not an entirely new development in the Ninth Circuit. Doubts regarding the declaration-space requirement were expressed years before the recent *Mori Seiki* decision. As one Ninth Circuit judge observed, "[t]here is cause to doubt the assumption underlying the fair opportunity requirement [of this circuit], that commercially knowledgeable parties need additional protections that Congress did not see fit to write into the statute." *Carman Tool & Abrasives, Inc. v. Evergreen Lines*, 871 F.2d 897, 900 (9th Cir.1989).

6. Baffled, we must note that plaintiff insurer's motion relies for case law support on Ninth Circuit precedent and a circuit case supposedly

from our appellate court, the First Circuit, in "*Cincinnati Milacron v. M/V American Legend* 784 F.2d 1161 (4th Cir.1986)." (*See, e.g., Motion for Partial Summary Judgment and Memorandum in Support Thereof*, Docket Document No. 6, at 5). Plaintiff Granite makes two inexcusable mistakes: First, the cited case is *not* a First Circuit case, but rather a Fourth Circuit case. Second, on November 6, 1986, less than nine months after the above panel's decision was handed down, the Fourth Circuit sitting en banc *overturned* the panel's decision cited in the brief, aligning Fourth Circuit law with the plurality position first articulated by the Fifth Circuit, as we describe. *See Cincinnati Milacron, Ltd. v. M/V American Legend*, 804 F.2d 837 (4th Cir. 1986) (en banc).

*Brown & Root, Inc. v. M/V Peisander*, 648 F.2d 415, 420, 424 (5th Cir.1981) (citation omitted) (emphasis added). The express adoption of COGSA and the publishing of different shipping rates, according to the Fifth Circuit, constitute prima facie evidence that the shipper was given a fair opportunity to declare a higher value, pay a higher freight charge, and benefit from a higher liability limitation on the part of the carrier. Consequently, the Fifth Circuit in *Brown & Root* did not require the face of the bill of lading to include a value-declaration box, unlike the Ninth Circuit's supposed requirement. The Fifth Circuit strongly reaffirmed this decision in *Wuerttembergische & Badische Versicherungs–Atiengesellschaft v. M/V Stuttgart Express*, 711 F.2d 621 (5th Cir. 1983).[7]

The Second Circuit, Fourth Circuit, and Eleventh Circuit have followed the Fifth Circuit's reasoning. *See Stolt Tank Containers, Inc. v. Evergreen Marine Corporation*, 962 F.2d 276, 280 (2d Cir.1992); *General Electric Co. v. M/V Nedlloyd*, 817 F.2d 1022, 1029 (2d Cir.1987); *Binladen BSB Landscaping v. M/V "NEDLLOYD ROTTERDAM", etc.*, 759 F.2d 1006, 1017 n. 12 (2d Cir.), *cert. denied*, 474 U.S. 902, 106 S.Ct. 229, 88 L.Ed.2d 229 (1985); *Petition of Isbrandtsen Company*, 201 F.2d 281 (2d Cir.1953); *Pearson v. Leif Hoegh & Company, A/S*, 953 F.2d 638 (Table), 1992 A.M.C. 1025 (4th Cir.1992) (not officially reported); *Aetna Ins. Co. v. M/V Lash Italia*, 858 F.2d 190, 193–94 (4th Cir. 1988); *Cincinnati Milacron, Ltd. v. M/V American Legend*, 804 F.2d 837 (4th Cir. 1986) (en banc); *Insurance Co. of North America v. M/V OCEAN LYNX*, 901 F.2d 934, 939 (11th Cir.1990).

### 3. *First Circuit Precedent*

The First Circuit has not directly addressed the issue in question. However, the First Circuit has tended to construe COGSA in a manner similar to the Fifth Circuit's interpretation. Perhaps the most analogous First Circuit case for our analysis here is *Insurance Co. of North America v. Puerto Rico Marine Management, Inc.*, 768 F.2d 470 (1st Cir.1985), *cert. denied*, 474 U.S. 1102, 106 S.Ct. 885, 88 L.Ed.2d 920 (1986). In *Puerto Rico Marine Management, Inc.*, the First Circuit recognized as valid the stipulations found among the terms of the reverse side of a bill of lading, specifically COGSA's one-year, time-for-suit limitation. This decision implies that the First Circuit takes the view of the plurality of the circuits that parties to a COGSA-governed sea transport agreement are best situated to determine the respective liabilities involving the shipment. The decision also highlights a philosophical difference between the First Circuit and most panels of the Ninth Circuit, namely that the latter circuit has historically required a value-declaration space because it assumed that the parties were in unequal bargaining positions and could not be expected to read and understand all of the provisions on the reverse side of a bill of lading. The First Circuit, in *Puerto Rico Marine Management, Inc.*, must have assumed exactly the opposite in finding valid and binding a key provision stated on the reverse side of a bill of lading.

Also, the Supreme Court, the First Circuit, and various district courts within the circuit have decided cases which tend to support the Fifth Circuit's plurality view. *Cf. Union P.R. Co. v. Burke*, 255 U.S. 317, 321–23, 41 S.Ct. 283, 284–85, 65 L.Ed. 656 (1921) (support for the idea that publication of alternative rates allows carrier to decrease its liability in exchange for a lower tariff); *Antilles Ins. Co. v. Transconex, Inc.*, 862 F.2d 391, 391–93 (1st Cir.1988) (approval of a COGSA-like, domestic traffic bill of lading liability limitation of $50 per package because plaintiff had a valid choice of shipping rates); *Polyplastics, Inc. v. Transconex, Inc.*, 827 F.2d 859, 862 (1st Cir.1987) (dictum on the COGSA standard for agreed-value limitations suggests an ad valorem rate as a second choice validates a $500 limitation); *Eyitayo*

---

7. "[W]e have firmly established the position in [*Brown & Root, Inc.*] that the option need not be included on the face of the bill of lading.... Further, we concluded that the shipper carries the burden of proving that an opportunity for choice of evaluations and rates did not in fact exist." *Wuerttembergische & Badische Versicherungs–Atiengesellschaft v. M/V Stuttgart Express*, 711 F.2d 621, 622 (5th Cir.1983).

*v. Nedlloyd Lines, B.V. Corp.,* 1992 WL 359642, \*1, 1992 U.S. Dist. LEXIS 18164, \*1–2 (D.Mass. Nov. 10, 1992) (application of COGSA "U.S.A. Clause Paramount" in a bill of lading effectively limits liability) (unpublished opinion); *Hanover Ins. Co. v. Drake Marine,* 440 F.Supp. 686, 688–89 .(D.P.R. 1977) (discussion of preeminence of COGSA governance).

### B. Adoption of Plurality View of Fair Opportunity

#### 1. What is the Standard for Fair opportunity?

■ Following the guidance of First Circuit case law and the decisions of the Second Circuit, Fourth Circuit, Fifth Circuit, and Eleventh Circuit, we adopt the view that a COGSA clause paramount on the reverse side of a bill of lading gives the shipper sufficient notice that the COGSA liability limitation applies unless a higher value of the freight is declared on the face of the bill. Unlike the ambiguous Ninth Circuit standard, there need be no space on the face of the bill reserved specifically for a cargo value declaration. The carrier has no duty in this context to undertake positive steps to query the shipper about cargo value or concealed contents of containers. Standard bills of lading already contain a large space in which the shipper may detail—to the extent the shipper believes necessary and most advantageous—the cargo, its value, and the impact of value on shipping charges.[8] When proper notice has been given of the inclusion of the COGSA liability limitation, the shipper-designated space on the face of the bill of lading serves to give the shipper a *fair opportunity* to declare a cargo value higher than the COGSA limitation :and to put the sea carrier on notice of its possible increased liability.

#### 2. Justification for Adopting the Plurality Fair Opportunity Standard

"All jurisdictions that have considered the question appear to agree that a recitation in the bill of lading of the limited liability language of 46 U.S.C.[App.] § 1304(5) is prima facie evidence of fair opportunity." *Cincinnati Milacron, Ltd. v. M/V American Legend,* 784 F.2d 1161, 1164, *different results reached on reh'g,* 804 F.2d 837 (4th Cir.1986) (en banc) (adopting the opinion expressed in the dissent to the panel decision, *Cincinnati Milacron, Ltd.;* 784 F.2d at 1166, that COGSA liability limitation language need not even be apparent on a short-form bill of lading to be binding, as long as a long form with the language is adequately posted). Moreover, we contend that the plurality view pertaining to shippers' fair opportunity to declare a cargo value higher than the COGSA limitation better compliments the set of relationships among genuine, enterprising, sea transport decision-makers as they transact business in the real world, thus protecting shippers, carriers, and insurers from unintended responsibilities or unanticipated liabilities, following the legislative intent underlying COGSA's passage, and acting as an expected and appropriate extension of the principles of contract law.

#### a. Principles of Contract Law

In a standard sea cargo bill-of-lading context, there are two primary parties agreeing to the intended transportation: The shipper and the carrier. Both parties are assumed to be more or less rational decision-makers who are pursuing their own interests. " 'In international shipping, a high level of sophistication is the norm. Furthermore, a professional freight forwarder generally arranges the details of the shipping contract, even in those rare cases where the shipper is not itself experienced.' " *Carman Tool & Abrasives, Inc. v. Evergreen Lines,* 871 F.2d 897, 900 (9th Cir.1989) (citing Michael Sturley, *The Fair Opportunity Requirement under COGSA Section 4(5): A Case Study in the Misinterpretation of the Carriage of Goods by Sea Act (Part II),* 19 J.Mar.L. & Com. 157, 179 (1988)). The resulting agreement embodied in the form of a bill of lading involves the exchange of some form of consideration from the shipper for the service provided by the carrier of shipping the cargo. The stipulations on the reverse side of a standard bill of

---

**8.** *See* discussion at page 1128, *infra.* The bill of lading in this case has a space approximately 5″ × 7″ marked "Above Particulars as Described by Shipper," in which the shipper may insert any relevant information, including a declaration of value, at his discretion.

lading, such as the one at the crux of this controversy, act as a contract clause which explicitly invokes COGSA's liability limitation unless the shipper takes steps to indicate an intent to negate the clause by declaring a higher value of the cargo. There is nothing in a standard bill of lading that suggests that the carrier must provide the shipper with *additional* notice of the COGSA limitation. *See* 46 U.S.C.App. § 1300 *et seq.*

The shipper is not a disinterested party but rather has a strong incentive to protect the value of its cargo, as the carrier has a clear incentive to limit, or at least ascertain, its potential liability. As a matter of intelligent policy, therefore, the law should allow both parties to be able to work in their own interests and be able to rely on the terms of a mutual agreement between them, particularly an accord as basic as the cost of and potential liabilities for a sea carriage. Such a rule "simply recognizes that within the constraints of the lower limit on liability set by COGSA, the allocation of risk in shipping is a matter governed by contract, and best determined by the explicit agreement of the parties." *Binladen BSB Landscaping v. M/V "NEDLLOYD ROTTERDAM",* etc., 759 F.2d 1006, 1016 (2d Cir.), *cert. denied,* 474 U.S. 902, 106 S.Ct. 229, 88 L.Ed.2d 229 (1985). If the law does not encourage a sense of solid reliance in contracting, the largely market-oriented system we have chosen would rest on shaky ground indeed. We must recognize that an agreement between shipper and carrier is a voluntary one, and public policy suggests that law should defer to the decisions of the parties as much as is practicable to arrive at a mutually beneficial agreement. Thus, the fair opportunity standard of the plurality of the circuits fits well within contract law theory.

#### b. *Legislative Purpose of COGSA*

■ The legislative intent of COGSA supports the plurality view of what constitutes prima facie evidence of a shipper's fair opportunity to declare a higher value. COGSA, as we noted above, is the codification of an international convention, the Hague Rules, designed to provide uniformity to the law governing transportation of cargo by sea. One important aspect of the international

agreement and its United States counterpart is the standardization of liability expectations. *See* Grant Gilmore and Charles L. Black, Jr., *The Law of Admiralty* § 3–24 at 143–44 (2d ed. 1975). In essence, the purpose of these laws is to allow international maritime actors to operate with greater efficiency and under a mantle of fairness. With an international legal standard for carrier liability, all parties involved in international shipping—ideally no matter where on the face of the planet—may rely on the principles and practicalities with which they have become familiar in previous dealings. As Professor Michael Sturley has noted:

> International uniformity was the principal goal [of the Hague Rules], and an American court should therefore strive to construe COGSA consistently with other nations' interpretations of their domestic enactments of the Hague Rules.... [O]ther nations have not made the mistake [of even adding a fair opportunity requirement]. It ... interferes with COGSA's more specific goals. It is unclear, unpredictable, and difficult to apply in commerce. It fosters expensive litigation.... The courts that imposed the requirement were wrong to do so, and future courts should avoid the error.

Michael Sturley, *The Fair Opportunity Requirement under COGSA Section 4(5),* 19 J.Mar.L. & Com. 157, 160, 165, 203 (1988) (as quoted in *Carman Tool & Abrasives, Inc. v. Evergreen Lines,* 871 F.2d 897, 900 n. 7 (9th Cir.1989)).

■ COGSA is one country's relatively successful attempt to give life to a larger, international agreement. To achieve the best results from its enactment, we believe that COGSA should be interpreted in light of the statute's overall international purpose of clarity and uniformity. *See generally* David Michael Collins, *Comment: Admiralty—International Uniformity and the Carriage of Goods by Sea,* 60 Tul.L.Rev. 165 (Oct.1985). Therefore, diminishing the plain meaning of COGSA provisions regarding bills of lading as the Ninth Circuit has done in preceding years, hampers the public policy and legislative purpose behind COGSA's enactment.

#### c. *Protecting Parties' Expectations*

The plurality fair opportunity standard that we adopt protects shippers, carriers, insurers, and other parties involved in sea transport by clearly defining the rights and responsibilities of shippers and carriers. Moreover, the plurality view takes into consideration the practical implications of COGSA's liability limitation.

Shippers, for example, should be the parties to take steps to declare a value higher than the COGSA limitation because shippers know what they are shipping and how much the cargo is worth. Often times the containers that house the cargo are sealed and the inside is never seen by carriers. Thus, carriers rely on the COGSA limitation when shippers do not make an effort to declare a higher value. If shippers are concerned with the carrier's liability in transporting cargo by sea, the shippers should be under a duty to put the presumptively ignorant carrier on notice of what is being shipped and its value. Otherwise, a carrier could never know the kind of care to give to their cargo containers.

In addition, the liability limitation clause guarantees that carriers will have a real stake, $500 per package or CFU,[9] in safely transporting cargo from port to port. Under COGSA, liability cannot be limited below $500 per package or CFU. *Hanover Ins. Co. v. Shulman Transport Enterprises, Inc.*, 581 F.2d 268, 270 (1st Cir.1978).

#### d. *The Real World of Shipping: Rate Choices and Insurance*

Another variable present in the real world of shipping transactions is the use of transportation insurance. Shippers may decide not to declare a higher value than the COGSA limitation because their insurance policy does not so require, thus giving shippers the opportunity to pay the lowest freight rate after obtaining appropriate insurance that will cover damages regardless of the limitation level protecting carriers. Many policies, however, may not provide complete coverage for all types of losses. *See* Grant Gilmore and Charles L. Black, Jr., *The Law of Admiralty* § 3–47 at 190 (2d ed. 1975). Carriers

cannot be expected to read the minds of shippers as they make intelligent and at times unintelligent choices regarding shipping rates and the acquisition of third-party insurance. Nor can carriers be expected to see through opaque container walls to determine if shippers have made the correct insurance and transportation rate choices. Fair opportunity for shippers to declare a higher value, therefore, can only reasonably mean that shippers are put on notice of the COGSA limitation in the language found in bills of lading and are allowed at their discretion to put carriers on notice of their cargo's excess value. In the real world, the vast majority of United States shippers are very familiar with COGSA and its liability limitation, since this legislation governs their field of practice or expertise. If a given shipper happens to act in a negligent or reckless manner in arranging a cargo transport with a carrier, the burden or detrimental impact of the shipper's decision should rest on the shoulders of the decision-maker, not the carrier. The carrier should be liable only for the amount agreed on with the shipper, be that the COGSA-limited amount or a greater sum.

### VI.

#### *Discussion: Defining a COGSA 'Package' and 'Customary Freight Unit'*

"In the last fifteen years or so, a very great deal of international transport has come to be carried in 'containers', of such size as to be movable as units behind trucks, or piggy-back on flatcars, from any inland point to the ship, and from the ship to any inland point, without being opened. This combined transport raises new legal questions; the courts are struggling with these, under statutes enacted quite without prevision of or provision for this revolution, and attempts at rationalization through international negotiation are in progress." *See* Grant Gilmore and Charles L. Black, Jr., *The Law of Admiralty* § 3–24 at 144 (2d ed. 1975). When COGSA was adopted, "[f]ew, if any, ... could have foreseen the change in the optimum size of shipping units that has arisen as the result of technology advances in

9. The Hague Rules valued the limitation as 100 British Pounds. *See 1924 International Conven-* *tion for the Unification of Certain Rules of Law relating to Bills of Lading.*

the transportation industry." *Standard Electrica, S.A. v. Hamburg Sudamerikanische Dampfschiffahrts–Gesellschaft,* 375 F.2d 943, 945 (2d Cir.), *cert. denied,* 389 U.S. 831, 88 S.Ct. 97, 19 L.Ed.2d 89 (1967).

COGSA speaks of two types of shipping quanta in determining the limited liability of a carrier: $500 per *package* or, "in the case of goods not shipped in packages, per *customary freight unit....*" 46 U.S.C.App. § 1304(5) (emphasis added). The obvious interpretational problems are two-fold: reasonably defining when goods are in packages, and if they are not in packages, reasonably determining the customary freight unit.

### A. *What Constitutes a COGSA Package?*

■ Determining a COGSA package has proven to be a source of controversy and confusion in the nation's courts. The paucity of legislative history has complicated the mission of courts in discerning the fundamental meaning of a COGSA package. On the largest scale and under narrow circumstances, a shipping container may be considered a COGSA package when the bill of lading does not indicate the existence of smaller containers within the larger receptacle. *See, e.g., Stolt Tank Containers, Inc. v. Evergreen Marine Corp.,* 962 F.2d 276, 280 (2d Cir. 1992) (five containers holding liquid chemicals found to be COGSA packages). On the smallest scale, a carton containing a single good or relatively few goods has been considered a COGSA package. *See, e.g., Vegas v. Compañia Anónima Venezolana de Navegación,* 720 F.2d 629, 630 (11th Cir.1983) (individual cartons of brake parts considered COGSA packages rather than the two "master cartons" holding all 109 cartons). And there are a multitude of other permutations of types and sizes of boxes, holders, and cartons that may reasonably be deemed packages for COGSA purposes.

The First Circuit has not had occasion to adopt an analytical procedure for determining COGSA packages. The Second Circuit, in *Binladen BSB Landscaping v. M/V "NEDLLOYD ROTTERDAM", etc.,* 759 F.2d 1006, 1011–17 (2d Cir.), *cert. denied,* 474 U.S. 902, 106 S.Ct. 229, 88 L.Ed.2d 229 (1985), however, adopted a coherent, thoughtful, and thorough test which we find compelling. The *Binladen* court shrewdly observed the problem of "construing [COGSA] ... [in] evaluat[ing] diverse and occasionally idiosyncratic items shipped in various forms—bundles, boxes, cartons, bales, coils, crates, rolls, skids, pallets, and containers—in order to determine what units, if any, constitute COGSA 'packages.'" *Id.* at 1012.

■ With the containerization problem in mind, the opinion develops four principles that may be used to classify cargo into COGSA packages. These principles include (1) looking to the bill of lading as a primary source of understanding the nature of the shipment, (2) determining if an item or items have been prepared for transport, *i.e.,* packaged, (3) establishing that a large-scale container should not be defined as a package if the bill of lading describes the container's subunits or if the parties expressly agree that the container is not a COGSA package, and (4) recognizing that if the bill of lading does not describe the containerized cargo in terms of individual packages, the freight should be considered "goods not shipped in packages" and prospectively as COGSA packages.[10] *See Hayes–Leger Associates, Inc. v. M/V Oriental Knight,* 765 F.2d 1076, 1080–81 (11th Cir.1985) (describing the holding in *Binladen BSB Landscaping,* 759 F.2d at 1012–13) (quoting 46 U.S.C. § 1304(5)). *See also Aluminios Pozuelo Ltd. v. S.S. Navigator,* 407 F.2d 152, 155 (2d Cir.1968); *Mitsui & Co. v. American Export Lines, Inc.,* 636 F.2d 807, 821 (2d Cir.1981).

---

**10.** We recognize that the rule established by us today, which will henceforth limit a carrier's liability under the same circumstances to $500 per container, resolves an uncertainty noted in earlier decisions ... and that, in view of this uncertainty, the parties might have reasonably believed the description of the number of plants on the bills of lading [of this case] was sufficient to bring the shipment within [a previous decision] to the effect that a container whose contents are disclosed ... should not itself be treated as a package.
*Binladen BSB Landscaping v. M/V "NEDLLOYD ROTTERDAM", etc.,* 759 F.2d 1006, 1016 (2d Cir.), *cert. denied,* 474 U.S. 902, 106 S.Ct. 229, 88 L.Ed.2d 229 (1985) (citations omitted).

■ The Eleventh Circuit extracted a two-part test from the *Binladen* principles described above:

(1) when a bill of lading discloses the number of COGSA packages in a container, the liability limitation of section 4(5) applies to those packages; but (2) when a bill of lading lists the number of containers as the number of packages, and fails to disclose the number of COGSA packages within each container, the liability limitation of section 4(5) applies to the containers themselves.

*Hayes–Leger Associates, Inc.*, 765 F.2d at 1080.

■ This analytical approach is most controversial when it leads to a conclusion that particular shipping containers are themselves COGSA packages. However, "notwithstanding [the] traditional reluctance to treat a container as a COGSA package, ... the terms of the bill of lading should govern; if it lists the container as package and fails to describe the objects that can reasonably be understood from the description as being packages, the container must be deemed a COGSA package. This rule not only accords with the 1968 Brussels Protocol, ... but has the virtue of certainty." *Binladen BSB Landscaping v. M/V "NEDLLOYD ROTTERDAM"*, etc., 759 F.2d 1006, 1015 (2d Cir.), *cert. denied*, 474 U.S. 902, 106 S.Ct. 229, 88 L.Ed.2d 229 (1985). Both the Second Circuit and the Eleventh Circuit have held that recognition of a container as a COGSA package will be effective prospectively, and that in cases with bills of lading concurrent to or preceding the case of first instance, courts should apply the customary-freight-unit liability limitation to containers.

We adopt the analysis of the Second Circuit and its interpretation by the Eleventh Circuit not only because of the logic and reasonableness of the *Binladen* principles, particularly the focus on the bill of lading as the primary interpretational factor, but also because our usage of these principles furthers the goal of national and international uniformity of sea cargo law. As the Eleventh Circuit noted, the Second Circuit's *Binladen* decision comports well with the various international agreements regarding shipping

norms, including the 1968 Brussels Protocol (otherwise known as the Visby Amendments) to the Hague Rules. *Binladen*, 759 F.2d at 1012–13. Thus, the adherence of successively more jurisdictions of the United States, such as the District of Puerto Rico, to these international precepts provides more uniformity to this area of maritime law and produces the consequential advantages of international consistency.

**B. *What is a Customary Freight Unit?***

COGSA provides that the liability for non-packaged goods is the product of the $500 limitation and the number of customary freight units. While the $500 limitation may be easily understandable, the customary freight unit demands more attention. There are two distinct methods utilized in the federal circuit courts for determining a customary freight unit: the cargo-classification practice and the bill-of-lading method. The cargo-type practice divines the customary freight unit by determining the customary unit for figuring the freight rate in international commerce for a particular type of good. The second, bill-of-lading procedure ascertains the customary freight unit by examining the methodology behind the calculation of shipping rates for the cargo at issue, relying on the terms of the particular bill of lading and tariff governing the transaction in question.

A general determination of the industry's customary means of figuring freight costs for a particular type of good may at first blush seem like a better interpretation of the statutory idea of a "customary freight unit." 46 U.S.C.App. § 1304(5). *See Waterman S.S. Corp. v. United States Smelting, Refining & Mining Co.*, 155 F.2d 687, 693–94 (5th Cir.), *cert. denied*, 329 U.S. 761, 67 S.Ct. 115, 91 L.Ed. 656 (1946). However, the majority of the circuits that have addressed the issue in the modern era have tended to recognize the customary freight unit as the unit specifically employed by the parties in arriving at the rate charged for shipment. However, the methods are often confused as indistinct:

A customary freight unit refers to the unit of cargo '*customarily used* as the basis for the calculation of the freight rate to be charged.' *General Motors Corp. v.*

*Moore–McCormack Lines, Inc.,* 451 F.2d 24, 25 (2d Cir.1971) (citing *Brazil Oiticica Ltd. v. The BILL,* 55 F.Supp. 780, 783 (D.Md.1944)). In computing the customary freight unit, therefore, we must look to *the unit which the carrier actually used* to compute the freight charge for the shipment. *Croft & Scully Co. v. M/V Skulptor Vuchetich,* 664 F.2d 1277, 1282 (5th Cir. 1982).

*Aetna Ins. Co. v. M/V Lash Italia,* 858 F.2d 190, 193 (4th Cir.1988) (emphasis added). But there is certainly a difference between the two approaches to the customary-freight-unit question. One method focuses primarily on an industry custom and the other on the agreement between the litigating parties.

Absent First Circuit precedent, we adopt a view similar to the Second Circuit, Fourth Circuit, and Fifth Circuit perspectives on ascertaining the customary freight unit for COGSA purposes. *See FMC Corp. v. S.S. Marjorie Lykes,* 851 F.2d 78, 79–80 (2d Cir. 1988); *Binladen,* 759 F.2d at 1016; *General Motors Corp. v. Moore–McCormack Lines, Inc.,* 451 F.2d 24, 25 (2d Cir.1971); *Caterpillar Overseas, S.A. v. Marine Transport Inc.,* 900 F.2d 714, 723 (4th Cir.1990) (adopting the Second Circuit's decision in *FMC Corp.*); *but see Aetna Ins. Co.,* 858 F.2d at 193 (contradictory quote above); *Cf. Tamini v. Salen Dry Cargo AB,* 866 F.2d 741, 743 (5th Cir. 1989); *see also Croft & Scully Co.,* 664 F.2d at 1282. The other circuits that have discussed the definition of a "customary freight unit" have been vague or unclear. *See Institute of London Underwriters v. Sea–Land Service, Inc.,* 881 F.2d 761, 764 (9th Cir.1989) (unclear which method being used, customary or bill-of-lading); *Hayes–Leger Associates, Inc. v. M/V ORIENTAL KNIGHT,* 765 F.2d 1076, 1081 n. 10 (11th Cir.1985) (unclear which method being used, remanded to district court for a determination of the customary freight unit).

■■■ We agree with the Second Circuit, Fourth Circuit, and Fifth Circuit that the agreement between the parties, the bill of lading, ought to be the starting point for

determining the customary freight unit. "Absent any ambiguity there, the inquiry is ended, and both parties are bound to the freight unit therein adopted. This rule provides certainty and fairness to both sides.... [Such a rule] will 'foster certainty and security in the shipping business.'" *FMC Corp.,* 851 F.2d at 81 (quoting *Allied International v. S.S. Yang Ming,* 672 F.2d 1055, 1057 (2d Cir.1982)). If, however, the bill of lading and the published tariff do not allow the court to decipher the customary freight unit used to determine the freight cost, the court should only then go beyond the bill of lading to general industry custom to seek an answer.

This approach, and that of the Second Circuit, Fourth Circuit, and Fifth Circuit with regard to determining the meaning of a customary freight unit, is harmoniously consistent with the positions we have taken with regard to the fair opportunity doctrine of COGSA liability limitation and the determination of what constitutes a COGSA package. In all three legal questions, we join the plurality of circuits in resolving conflicts through the primary guidance of the effective bill of lading—the document that is prima facie evidence of the agreement of the parties.

## VII.

*Applying the Fair Opportunity Standard and Liability Limitation Provisions of COGSA to the Wahlco Shipment*

### A. *Wahlco Had a Fair Opportunity to Declare a Higher Cargo Value*

#### 1. *The Parties' Agreement Details the COGSA Liability Limitation*

■■■ In the instant case, the shipper, Wahlco, had a fair opportunity in the bill of lading to declare a value higher than the COGSA limitation. First, the bill of lading expressly invoked the COGSA liability limitation and expressly stated that the shipper could circumvent the limitation by declaring a higher value and paying an ad valorem tariff: [11]

---

11. *See Tariff: Ad Valorem Rates—Declaration of Value on Bills of Lading,* FMC 13, Sept. 5, 1985, Rule 12, Docket Document No. 9, *Appendix.*

6. Carrier's Responsibility

\*    \*    \*    \*    \*    \*

(1) *Where* the stage of Carriage where *loss or damage* occurred is *not known*

  (a) Exclusions

\*    \*    \*    \*    \*    \*

  (b) Burden of Proof

\*    \*    \*    \*    \*    \*

  (c) Limitation of Liability *Except as provided in Clause 7(3)* [see Clause 7(3) below], total compensation shall in no circumstances whatsoever and howsoever arising exceed US $2.50 per kilo of the gross weight of the Goods lost or damaged.

(2) *Where* the stage of Carriage where *loss or damage* occurred is *known*

\*    \*    \*    \*    \*    \*

the liability of the Carrier in respect of such loss or damage shall be determined:

\*    \*    \*    \*    \*    \*

  (b) in case of shipments *to or from ports or places of Puerto Rico by the provisions of the Carriage of Goods by Sea Act* of the United States approved 16th April, 1936 if the loss or damage is known to have occurred during sea-carriage or during Carrier's custody of the goods before loading or after discharge in ports of Puerto Rico. . . .

\*    \*    \*    \*    \*    \*

7. Sundry Liability Provisions

\*    \*    \*    \*    \*    \*

(3) The merchant [or shipper] agrees and acknowledges that the Carrier has no knowledge of the value of the Goods, and that higher compensation than that provided above [under the U.S.–Carriage of Goods By Sea Act of 1936 ("COGSA") ] may not be claimed unless, with the consent of the Carrier, the value of the Goods declared by the Shipper prior to the commencement of Carriage is stated on this Bill of Lading and extra Freight paid. If required in that case, the amount of the declared value shall be substituted for the limits laid down above [in clause 7(2), namely COGSA's $500–per package or customary freight unit]. Any partial loss or damage shall be adjusted pro rata on the basis of such declared value.

(*See Hapag–Lloyd Bill of Lading No. AYLA FLX 91–621*, Docket Document No. 8, *Appendix*) (emphasis added). Thus, according to the plain terms of the bill of lading, no matter where the damage occurs, the carrier's liability is limited by a COGSA provision unless the shipper declares a higher value in the bill of lading. This constitutes prima facie evidence of fair opportunity.

The bill of lading at issue has a space approximately 5″ × 7″ on its face marked "ABOVE PARTICULARS AS DECLARED BY SHIPPER" in which the shipper described the cargo in very general terms, along with the freight charge. Had the shipper wanted to declare a higher value of the cargo to circumvent the COGSA liability limitation, the bill of lading certainly contained ample space for such a declaration.[12]

(*See Hapag–Lloyd Bill of Lading No. AYLA FLX 91–621*, Docket Document No. 8, *Appendix*).

2. ***Hapag–Lloyd Offered a Choice of Carriage Rates***

Moreover, Hapag–Lloyd had a published ad valorem tariff that itself evidenced shipper's ability to declare a higher value, pay a higher price for the shipping, and enjoy insurance-like liability on the part of Hapag–

---

12. Wahlco was presumably experienced in shipping, and Hapag–Lloyd claims—*without opposition*—that Wahlco's professional transport agent, Air Sea Forwarder's, was experienced in evaluating standard bills of lading. (*See Motion Requesting Leave to Supplement Materials*, Document No. 14, at 2). In fact, shipper Wahlco, not a party in this case, has *never* stated that it was unaware of the COGSA limitation or its conse-

quences. From our standpoint, the shipper made a *rational decision in opting for the lowest* freight rate and taking out an insurance policy which would cover practically any loss. In so doing, Wahlco acted deliberately, and considering the facts of this case, intelligently in protecting itself from risk: Wahlco's insurance saved the shipper from a six-figure loss.

Lloyd. (*See Tariff: Ad Valorem Rates— Declaration of Value on Bills of Lading*, FMC 13, Sept. 5, 1985, Rule 12, Docket Document No. 9, *Appendix* ). Under the ad valorem rate, Wahlco would have paid "[i]n the case of a package, the value of which is declared on the Bill of Lading at an amount exceeding $280.00, an additional charge of 2% Ad Valorem ... over and above the freight rate." *Id.* Therefore, if the value of the cargo was $1,900,000, the approximate shipping charge would have been $38,000 rather than the basic rate actually paid of $8,822.04.

### 3. Wahlco Acquired Third–Party Cargo Insurance

Perhaps most telling, the shipper had secured a comprehensive, third-party insurance plan from plaintiff Granite to cover the cargo en route to England. The insurance policy went so far as to represent expressly that the shipper could utilize the carrier's least expensive freight rate for its cargo. The policy declares at Section 28: "Privilege is hereby given to ship goods covered by this Policy under usual released or limited liability bills of lading or shipping receipts *without prejudice* to the insurance hereunder." (*See Granite State Insurance Company Policy No. 24–60458*, Docket Document No. 6, *Exhibit I*, at 5) (emphasis added). Under these circumstances, particularly considering the language of the Granite insurance policy, it is understandable that Wahlco would opt for the lowest shipping rate despite the consequential activation of the COGSA limitation. The fact is that Wahlco was covered for the value of the cargo through its insurance with Granite, and choosing a higher freight rate— and correspondingly increased liability on the part of Hapag–Lloyd—would have been needlessly costly for Wahlco. Such a decision by Wahlco would have been tantamount to protecting the value of its cargo by purchasing two separate, but overlapping, insurance policies with different insurers in the

event that one or the other would become insolvent: A high price to the shipper protecting against a relatively small risk.

### 4. The Granite Insurance Policy Approved of Liability–Limiting Freight Rates

Plaintiff insurer Granite clearly understood that carrier liability limitations could be agreed to by Wahlco with respect to its insured cargo. As we discussed above, the insurance policy specifically anticipated that the insured would have the option of choosing the least expensive means of transport and the corresponding limitation on liability, and expressly informed Wahlco that such a freight-rate decision would not adversely affect the coverage of the insurance policy. (*See Granite State Insurance Company Policy No. 24–60458*, Docket Document No. 6, *Exhibit I*, at 5). Thus, it is evident that fair opportunity was provided to shipper Wahlco and indirectly to the insurer—although we note that no explicit duty is owed the insurer under the provisions of COGSA.

Having concluded that fair opportunity was afforded to the appropriate parties, we must next determine the potential liability of the carrier under the dictates of COGSA and the bill of lading governing the instant shipment.

### B. The Amount of the Liability Limitation for the Wahlco Cargo

Having found that Wahlco had a fair opportunity to declare a value higher than the COGSA liability limitation, we must follow COGSA law and determine the limit of Hapag–Lloyd's liability. In consonance with our emphasis on following the agreement of the parties, we first examine the bill of lading to discern whether the document identifies the number of COGSA packages or customary freight units.[13]

---

13. Plaintiff Granite's reliance on customs declarations or other documents with specific descriptions and valuations of the cargo is irrelevant to our interpretation of the bill of lading, primarily because such documents do not embody an agreement between the shipper and carrier. In fact, the existence of such documentation in the hands of the shipper reinforces the notion that

Wahlco could have declared a higher value in the bill of lading or at least given specific descriptions of what it considered COGSA packages or customary freight units. Wahlco did not provide this information; perhaps Wahlco's comprehensive insurance policy, particularly Section 28, made such cargo disclosures financially disadvantageous or irrelevant.

### 1. *Information From the Bill of Lading*

There were three containers shipped from Ponce to Felixstowe: Two "40' FLAT CONTAINERS [and one] 20' CONTAINER." The contents of or subcontainers within the three containers are not clearly described or listed in the bill of lading.[14] Wahlco, despite consequential liability limitations, did not declare a higher value or even a number of COGSA packages other than to list the dimensions of the three containers in the "packages" column of the bill along with a general description of what the three, *together*, contained. The bill of lading provides no information that would allow the carrier to discern the number of COGSA packages or to estimate a value for the unspecified cargo.

### 2. *The Two Forty–Foot Flat Containers*

■■■■■ The freight charges for the two forty-foot flat containers or platforms are simple lump sums of $3,400 each, not including the fuel charge. Do we treat them as COGSA packages, or should we determine the customary freight unit for the two containers? They, like the twenty-foot container, are listed by the shipper under the heading, "Number and kind of *packages; description of goods.*" (*Hapag–Lloyd Bill of Lading No. AYLA FLX 91–621*, Docket Document No. 8, *Appendix* ) (emphasis added). The shipper, however, did not detail the specific contents or provide the carrier with any number of subcontainer units that should be understood as COGSA packages. Thus, the two forty-foot containers fall into the category of containers that should be treated as

packages. *See Binladen BSB Landscaping v. M/V "NEDLLOYD ROTTERDAM", etc.,* 759 F.2d 1006, 1016 (2d Cir.), *cert. denied,* 474 U.S. 902, 106 S.Ct. 229, 88 L.Ed.2d 229 (1985); *accord Hayes–Leger Associates, Inc. v. M/V ORIENTAL KNIGHT,* 765 F.2d 1076, 1080–81 (11th Cir.1985). "Like the Second Circuit, however, we apply the . . . rule [ ] under which containers may be treated as COGSA 'packages' . . . prospectively only. For bills of lading prepared prior to the date of this decision, we will apply the 'goods not shipped in packages' limitation to such situations." *Hayes–Leger Associates,* 765 F.2d at 1080–81.[15] The liability limitation for "goods not shipped in packages" depends on the number of customary freight units of the cargo.

The freight rate at the heart of the agreement between Wahlco and Hapag–Lloyd treats each larger container as a single unit. Nowhere does Wahlco declare the number of COGSA packages as regards the two forty-foot trailers. "[A]bsent an agreement in the bill of lading as to the packaging of the cargo (by a description in the bill), goods placed in containers without being described as 'packaged,' will be classified as 'goods not shipped in packages'. . . . In this . . . . case the $500 liability limit will be applied to the 'customary freight unit' which will usually be the container." Thomas J. Schoenbaum, *Admiralty and Maritime Law* § 9–34 at 373 (practitioner's ed. 1987) (citation omitted).

There is no doubt that the freight rate was determined by considering each forty-foot

---

14. We could make the assumption that each 40' flat container held a "system[ ] skid assembly" and the single 20' container enveloped "6 PCS. HARDWARE AND PARTS, PROBES, PARTS and STABILIZERS." (*Hapag–Lloyd Bill of Lading No. AYLA FLX 91–621,* Docket Document No. 8, *Appendix* ). But such an assumption would be wrong according to non-bill-of-lading Wahlco documents and would demonstrate the dangers of not relying on the terms of the bill of lading itself.

15. As the court stated in *Hayes–Leger Associates,* 765 F.2d at 1080–81, when the bill does not list COGSA packages but only containers, and the containers were shipped at a per-container rate, prospectively the court should treat containers themselves as COGSA packages but should consider the containers involved in the case of first

instance as unpackaged goods. *See Binladen,* 759 F.2d at 1015. Cases contemporaneous with or preceding the rule-making case should be treated similarly. Thus, since this is a case of first instance in this jurisdiction, containers that would otherwise be treated as COGSA packages will be deemed unpackaged goods with COGSA liability limitation determined by the particular customary freight unit used to determine the instant freight rate. *See B. Terfloth and Cie (Canada) Inc. v. M/V Tropic Lure,* 682 F.Supp. 514, 515 (S.D.Fla.1987) (following the suggestion in *Hayes–Leger Associates,* 765 F.2d at 1080, that a container may be treated as a customary freight unit when the COGSA packages are not specified in the bill of lading and the transaction occurred before the *Hayes–Leger Associates* decision of July 16, 1985).

container as a unit or package. In response to our order of May 20, 1993, Hapag–Lloyd has submitted a copy of the current tariff schedule that was applied to the Wahlco shipment. The tariff provisions are endorsed with a Fed.R.Civ.P. 56 affidavit that remains unopposed. The forty-foot containers were shipped by Hapag–Lloyd, a participating carrier under Carol Lines, Eastbound Freight Tariff No. 3, FMC 13, Harmonized Code 84.00, Air Pollution Machinery On Platform Only, *Box Rate* of $3,400.00. (*See Tariff*, FMC 13, Apr. 28, 1993, Harmon. Code 84.00, Docket Document No. 19, at 5). Clearly the freight rate was calculated per "box" and not according to any other customary freight unit. This is further substantiated by Wahlco's shipping notice to Pentol stating that the first forty-foot container, HARU 4650434, held the two systems skid assembly, and the second larger container held various pumps, probes, and other miscellaneous hardware. (*See Wahlco Shipping Notice*, Docket Document No. 8, *Appendix* ). Since the weights and items in the two larger containers were evidently different, the application of the same $3,400 rate for each larger container indicates very clearly that the containers themselves were the basis of the $3,400 per unit rate. Given these facts and the law before us, we hold that the forty-foot containers were considered to be the customary freight units for determining the freight charge. Were we to face the same set of facts in a case with a bill of lading after the date of publication of this decision, we would treat each of the forty-foot trailers as a COGSA package.[16] By chance, such a distinction between the instant and prospective methods of determining COGSA liability does not change the liability limitation at issue in this case.

### 3. *The Twenty–Foot Container*

▮ According to the express terms of the bill of lading, the third, twenty-foot container's contents were shipped at a rate determined by the number of "CBMs" or cubic meters. Thus, cubic meters were the customary freight units. The third container's cargo included 4.99 cubic meters of materials, and the rate per cubic meter as set forth in the bill was $149. We should not, therefore, consider the third container as a COGSA package or a single CFU, since according to the bill of lading, the freight charge depended on the number of cubic meters. We find that the liability limitation for the third container is based on 4.99 customary freight units.

### 4. *Hapag–Lloyd's Total Liability Limitation*

The total number of COGSA packages and customary freight units of the Wahlco shipment is the sum of 4.99 for the twenty-foot container and one each for the forty-foot containers, or 6.99 customary freight units. Since the COGSA liability limitation applies,[17] we hold that Hapag–Lloyd is potentially liable for $500 for each package or customary freight unit, or a total of $3,495.00. Hapag–Lloyd's actual responsibility for the damage in question remains indeterminate at this point in the unfolding litigation; we have

---

16. While there appears to be no general rule, deeming containers as COGSA packages is certainly not unprecedented in the First Circuit. The District Court for the District of Massachusetts recently stated, "[r]egardless of size, shape or weight, cargo fully boxed or crated is a 'package' where the mode of packaging conceals the identity of the goods." *Eyitayo v. Nedlloyd Lines, B.V. Corp.*, 1992 WL 359642, at *1, 1992 U.S. Dist. LEXIS 18164, at *4 (D.Mass. Nov..10,.1992) (unpublished opinion). And in an older decision of this district court, there is further support for treating a container as a COGSA package when the method of paying for the transport is a flat rate for the single container, and there is no description of smaller packages within the container. *See Lucchese v. Malabe Shipping Co.*, 351 F.Supp. 588, 590 (D.P.R.1972).

17. While there are movements to increase the liability limitation applicable under COGSA and its international counterparts, we must apply the $500 limitation because it is the current law and it is embodied in the agreement at issue. *See generally* Paul S. Edelman, *Proposed Changes for Cargo Liability*, N.Y.L.J. at 3 (Aug. 7, 1992). Perhaps legislators will find that the current liability limitation figure is not adequate or fair; however, we emphasize that in this case the parties agreed to that sum. It is certainly not our intention or our duty to comment on the propriety of the parties' agreement or the need to amend sea cargo liability limitations. We leave that for national and international legislative bodies to determine.

only passed judgment on the narrow issue of the limitation of Hapag–Lloyd's liability, were it found to be responsible for the cargo damage.[18]

**IT IS SO ORDERED.**

18. The defendants and the plaintiff are granted FIVE (5) DAYS to express whether they will consent to the entry of judgment for $3,495.00. As we see it, the economics of a trial on the merits with a $3,495.00 maximum recovery would constitute a senseless waste of resources to the parties and the court. Such consent to judgment would be without the waiver of the right to appeal.