USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 93-1543 HENLEY DRILLING COMPANY, Plaintiff, Appellee, v. WILLIAM H. McGEE AND CNA CASUALTY OF PUERTO RICO, Defendants, Appellants. ____________________ No. 93-1548 HENLEY DRILLING COMPANY, Plaintiff, Appellee, v. MARINE TRANSPORTATION SERVICES, ETC. AND LUIS A. AYALA COLON SUCRS., INC., Defendants, Appellants. ____________________ APPEALS FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO [Hon. Raymond L. Acosta, U.S. District Judge] ___________________ ____________________ Before Torruella, Circuit Judge, _____________ Aldrich, Senior Circuit Judge, ____________________ and Cyr, Circuit Judge. _____________ ____________________ Keith A. Graffam, with whom Dario Rivera Carrasquillo, John ________________ _________________________ ____ E. Mudd and Cordero, Miranda & Pinto were on brief for plaintiff. _______ ________________________ Jose F. Sarraga for defendant Marine Transportation __________________ Services. Eugene F. Hestres, with whom Bird, Bird & Hestres was on _________________ _____________________ brief for defendant Luis A. Ayala Colon Sucrs., Inc. ____________________ September 27, 1994 ____________________ CYR, Circuit Judge. The central question in this case CYR, Circuit Judge. _____________ whether the $500 per-package limit on ocean carriage liability imposed by the Carriage of Goods by Sea Act (COGSA), 46 U.S.C. 1304(5), is applicable to an oil drilling rig requires the court to consider for the first time the COGSA-related "fair opportunity" doctrine. I I BACKGROUND BACKGROUND __________ Puerto Rico Electric Power Authority (PREPA) contracted with Henley Drilling Company (Henley) to conduct petroleum drilling operations in Puerto Rico. Marine Transportation Services-Sea Barge Group, Inc. (Sea Barge), an ocean carrier, agreed to transport Henley's drilling equipment from Houston to Puerto Rico, and return. PREPA obtained marine cargo insurance on the Henley drilling rig through William H. McGee & Co. (McGee) and CNA Casualty of Puerto Rico (CNA). Following an uneventful southbound voyage, Sea Barge retained a stevedoring contractor, Luis A. Ayala Col n Sucrs., Inc. (Ayacol), to stow the drilling rig aboard the barge for the return trip to Houston. When the barge arrived in Houston, however, Henley's huge drilling rig, valued at $629,000, was nowhere to be found. Henley sued Sea Barge, Ayacol, McGee, CNA and PREPA in the United States District Court for the District of Puerto Rico. Under the terms of their settlement agreement, PREPA, McGee and CNA were subrogated to the rights of Henley, leaving Sea Barge 3 and Ayacol as the only defendants. In March 1992, Sea Barge and Ayacol moved for partial summary judgment, contending that their liability, if any, could not exceed the $500 per-package/CFU limit imposed by COGSA.1 Contemporaneously, Ayacol and Sea Barge moved for summary judgment on the further ground that the stowing of the drilling rig aboard the barge for the return trip to Houston was improperly supervised by the marine surveyor retained by PREPA, thereby entitling Ayacol and Sea Barge to exoneration from liability. A magistrate judge recommended partial summary judgment in favor of Sea Barge and Ayacol, based on a finding that the drilling rig constituted a "package" within the meaning of COGSA 4(5), for which the maximum liability of the carrier is $500.2 The magistrate judge did not rule on the summary judgment claim for exoneration. McGee, CNA and PREPA objected to the magis- trate-judge's report and recommendation, which the district judge subsequently adopted over their objection. McGee, CNA and PREPA unsuccessfully moved for reconsideration by the district judge. CNA and McGee [collectively: "McGee"] appealed. Ayacol and Sea Barge cross-appealed, challenging the district court order adopting the magistrate-judge's report and recommendation insofar as it failed to grant Ayacol and Sea Barge exoneration from all liability and included no attorney fee award against McGee. ____________________ 1The COGSA-imposed liability limit applies to each package or "customary freight unit" ("CFU"). __ 2See note 1 supra. ___ _____ 4 II II DISCUSSION DISCUSSION __________ A. The McGee Appeal (No. 93-1543) A. The McGee Appeal (No. 93-1543) _______________________________ 1. Summary Judgment Standard 1. Summary Judgment Standard _________________________ We review a grant of summary judgment de novo. __ ____ Commercial Union Ins. Co. v. Walbrook Ins. Co., 7 F.3d 1047, 1050 _________________________ _________________ (1st Cir. 1993). Summary judgment is appropriate where the record, viewed in the light most favorable to the nonmoving party, reveals no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. Velez- ______ Gomez v. SMA Life Assur. Co., 8 F.3d 873, 874-75 (1st Cir. 1993). _____ ___________________ 2. The COGSA Liability Limitation 2. The COGSA Liability Limitation ______________________________ Section 1304(5) of COGSA, entitled "Rights and immuni- ties of carrier and ship," provides in relevant part: Neither the carrier nor the ship shall in any event be or become liable for any loss or damage to or in connection with the trans- portation of goods in an amount exceeding $500 per package . . . or in case of goods not shipped in packages, per customary freight unit . . . unless the nature and ______ ___ ______ ___ value of such goods have been declared by the _____ __ ____ _____ ____ ____ ________ __ ___ shipper before shipment and inserted in the _______ ______ ________ ___ ________ __ ___ bill of lading . . . . ____ __ ______ By agreement between the carrier, mas- ter, or agent of the carrier, and the shipper another maximum amount than that mentioned in this paragraph may be fixed . . . [but] in no event shall the carrier be liable for more than the amount of damage actually sustained. 46 U.S.C. App. 1304(5) (emphasis added). 5 The courts generally have required the carrier to afford the shipper a "fair opportunity" to avoid the COGSA "package/CFU" liability limitation through adequate advance notice. See, e.g., Carman Tool & Abrasives, Inc. v. Evergreen ___ ____ _______________________________ _________ Lines, 871 F.2d 897, 899 n.3 (9th Cir. 1989). As this court has _____ not adopted the COGSA "fair opportunity" doctrine, see Granite ___ _______ State Ins. Co. v. M/V Caraibe, 825 F. Supp. 1113, 1118-24 (D.P.R. ______________ ___________ 1993) (noting absence of First Circuit precedent on "fair opportunity" doctrine), we first examine the case law in other jurisdictions. All courts which have addressed the matter require the carrier to provide the shipper some notice of the COGSA "package/CFU" liability limitation, differing only as to the type of notice. See id. (examining circuit split as to level of ___ ___ notice required); see generally Michael F. Sturley, The Fair ___ _________ _________ Opportunity Requirement Under COGSA Section 4(5): A Case Study _________________________________________________________________ in the Misinterpretation of the Carriage of Goods by Sea Act _________________________________________________________________ (Part I), 19 J. Mar. L. & Com. 1, 13-17 (1988) (hereinafter, ________ "Sturley, Part I"); Michael F. Sturley, The Fair Opportunity _______ _____________________ Requirement (Part II), 19 J. Mar. L. & Com. 157 (1988) (here- _____________________ inafter, "Sturley, Part II"). The Ninth Circuit is thought to _______ have the more demanding notice requirement, see 2A Ellen Flynn & ___ Gina A. Raduazzo, Benedict on Admiralty 166, at pp. 16-28 to ______________________ 16-29 (Michael F. Sturley, contrib. ed. 1993) (hereinafter, 2A Benedict) (describing "strict" Ninth Circuit standard, citing ________ cases), mandating that the carrier provide the shipper legible 6 written notice of the COGSA "package/CFU" liability limitation in the bill of lading, employing language substantially similar to COGSA 4(5). See, e.g., Nemeth v. General S.S. Corp., 694 F.2d ___ ____ ______ ___________________ 609, 611 (9th Cir. 1982). Other courts, including the Second, Fourth, Fifth and Eleventh Circuits, simply require that the bill of lading include a "clause paramount" incorporating COGSA by reference. See, e.g., Insurance Co. of N. Am. v. M/V Ocean Lynx, ___ ____ _______________________ ______________ 901 F.2d 934, 939 (11th Cir. 1990), cert. denied, 498 U.S. 1025 _____ ______ (1991); General Elec. Co. v. M/V Nedlloyd, 817 F.2d 1022, 1029 _________________ ____________ (2d Cir. 1987), cert. denied, 484 U.S. 1011 (1988); Cincinnati _____ ______ __________ Milacron, Ltd. v. M/V American Legend, 804 F.2d 837, 837 (4th ______________ ____________________ Cir. 1986) (en banc) (per curiam), rev'g 784 F.2d 1161 (4th Cir. _____ 1986); Brown & Root, Inc. v. M/V Peisander, 648 F.2d 415, 424 ___________________ _____________ (5th Cir. 1981). The courts are in agreement that the carrier bears the burden of proving that it has afforded the shipper the requisite "fair opportunity" notice. See, e.g., General Elec., ___ ____ _____________ 817 F.2d at 1029; Tessler Bros. (B.C.) Ltd. v. Italpacific Line, _________________________ ________________ 494 F.2d 438, 443 (9th Cir. 1974). Our review leads us to conclude that the bill of lading in this case afforded "fair opportunity" notice sufficient to satisfy whatever essential requirements are imposed by these other courts. Constructive notice was afforded by the "clause paramount"3 legibly printed on the reverse side of the bill of ____________________ 3The bill of lading included a typical "clause paramount": 1. CLAUSE PARAMOUNT: This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act, approved April 16, 1936. 7 lading: "This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act . . . ." See ___ Cincinnati Milacron, 804 F.2d at 837 ("clause paramount" provides ___________________ constructive notice).4 A more particular notice was contained in the bill of lading "valuation clause": 20. VALUATION. Carrier shall not be liable in any event for any loss, damage, misdeliv- ery or delay with respect to the goods in an amount exceeding $500.00 lawful money of the United States per package, or in the case of goods not shipped in packages, per customary freight unit, unless the nature of the goods and a valuation thereof higher than $500.00 is declared in writing by Shipper on delivery of the goods to Carrier and inserted in the Bill of Lading and extra freight is paid thereon as required by the applicable tariff to obtain the benefit of such higher valua- tion. See Carman Tool, 871 F.2d at 899 n.4 (finding that bill of lading ___ ___________ provision substantially similar to that sub judice recited terms ___ ______ ____________________ See also 46 U.S.C. App. 1312 ("any bill of lading . . . ___ ____ containing an express statement that it shall be subject to the provisions of [COGSA] shall be subjected hereto as fully as if subject hereto by the express provisions of [COGSA] . . . Provid- _______ ed further, that every bill of lading . . . shall contain a ___________ statement that it shall have effect subject to the provisions of [COGSA]") (emphasis original); cf. Komatsu Ltd. v. States S.S. ___ ____________ ___________ Co., 674 F.2d 806, 810 n.6 (9th Cir. 1982) (rejecting statutory ___ challenge to "fair opportunity" doctrine based on 1312, because this section "leaves a carrier free to quote the language of section 4(5) in full"). 4McGee does not challenge the legibility of the COGSA notice. Cf. Nemeth, 694 F.2d at 611-12 (illegible recitation of ___ ______ COGSA 4(5) does not provide "fair opportunity" notice). 8 of COGSA 4(5) and thus afforded actual notice); cf. supra pp. ___ _____ 5-6 (quoting 46 U.S.C. App. 1304(5)).5 McGee contends that Sea Barge did not demonstrate its entitlement to summary judgment on compliance with the "fair opportunity" requirement because there was competent evidence that Sea Barge failed to offer PREPA ad valorem rates based on __ _______ the true value of the cargo. Specifically, McGee reiterates its claim below that Sea Barge failed to show that published tariffs were available for a drilling rig on this voyage.6 McGee relies primarily on the Fifth Circuit's language in Brown & Root: ____________ [T]he circumstances of the case before us do not overcome the prima facie evidence of the opportunity for a choice of rates and valua- tions . . . First, COGSA was expressly incor- porated in the bill of lading to thereby bring into play 4(5). Next, and more sig- ____ ____ nificantly, the published tariff which has __________ ___ _________ ______ ____________________ 5In light of our conclusion that the bill of lading met whatever "fair opportunity" notice requirements are imposed by other circuits, we refrain from embracing the "fair opportunity" doctrine itself, in any form. We take this course because the parties have assumed, from the outset, that a COGSA-related "fair opportunity" doctrine would apply. Thus, we leave for another day, and a proper adversarial setting, what we perceive to be a problematic question. See Michael F. Sturley, The Fair Opportu- ___ __________________ nity Requirement Under COGSA Section 4(5): A Case Study in the _________________________________________________________________ Misinterpretation of the Carriage of Goods by Sea Act (Part I), ________________________________________________________________ 19 J. Mar. L. & Com. 1 (1988); and Michael F. Sturley, The Fair ___ ________ Opportunity Requirement (Part II), 19 J. Mar. L. & Com. 157, 176 __________________________________ (1988) ("All of the available evidence suggests that the [COGSA] package limitation should not be subject to a fair opportunity requirement."). 6McGee relies on a deposition by William Lauderdale, the Sea Barge agent responsible for negotiating freight charges with PREPA, which states that the rate for transporting the drill rig was "outside" the tariff Sea Barge filed with the Federal Mari- time Commission, because this was "a single shipper on a single voyage, on a contract voyage." The record does not contain a copy of the Sea Barge tariff. Cf. infra note 7. ___ _____ 9 the effect of law very carefully gave Shipper ____ _______ a choice of valuations by a choice of pre- _ ______ __ __________ __ _ ______ __ ____ cisely definable freight rates. ______ _________ _______ _____ 648 F.2d at 424 (emphasis added, citations omitted); see also ___ ____ Wuerttembergische v. M/V Stuttgart Express, 711 F.2d 621, 622 _________________ ______________________ (5th Cir. 1983) (per curiam) (similar, applying Brown & Root). ____________ The controlling question before us therefore becomes: whether actual and constructive notice, without more, affords the shipper "fair opportunity," as a matter of law. Careful examination of the authorities has disclosed no appellate case which requires a valid tariff in addition to actual or constructive notice as an element of the "fair opportunity" doctrine. The Fifth Circuit, whose cases constitute the principal authority relied on by McGee, has reserved judgment on this matter: The facts of [Brown & Root, 648 F.2d at 424, ____________ and Wuerttembergische, 711 F.2d at 622] re- _________________ veal that we have not held . . . that the ___ mere incorporation of COGSA into a bill of lading constitutes prima facie evidence of fair opportunity. Because that circumstance _______ ____ ____________ is not before us in this case, we express no __ ___ ______ __ __ ____ _____ __ _______ __ opinion on the issue. _______ __ ___ _____ Couthino, Caro & Co. v. M/V Sava, 849 F.2d 166, 170 n.6 (5th Cir. ____________________ ________ 1988) (emphasis added). Other courts of appeals either directly hold that a tariff is not required if notice of the COGSA liabil- ____ ity limitation has been given, see, e.g., Ocean Lynx, 901 F.2d at ___ ____ __________ 939 ("Brown & Root thus adopted a system of constructive notice ____________ of an opportunity to declare excess valuation. Either a clause paramount in the bill of lading or a valid tariff filed with the __ Federal Maritime Commission . . . is sufficient to afford the 10 shipper an opportunity to declare excess value.") (citations omitted, emphasis added),7 or clearly imply such a rule, see, _____ ___ e.g., Aetna Ins. Co. v. M/V Lash Italia, 858 F.2d 190, 193 (4th ____ _______________ _______________ Cir. 1988) ("In this case [language reciting the COGSA liability limitation in the] bill of lading establishes prima facie evi- _____ _____ dence of fair opportunity by clearly outlining the limitation of liability and explaining the shipper's opportunity to avoid the limitation by declaring a higher value."); Carman Tool, 871 F.2d ___________ at 901 ("so long as the bill of lading, on its face, provides adequate notice of the liability limit and an opportunity to declare a higher value, the carrier has discharged its responsi- bility") (9th Cir.); cf. Komatsu, 674 F.2d at 811 (published ___ _______ tariff, without actual notice of the relevant provisions of COGSA, does not satisfy "fair opportunity" requirement). We thus eschew McGee's implicit invitation to augment the "fair opportunity" doctrine. As the Ninth Circuit observed in a similar context: We decline to expand the fair opportunity requirement as suggested by [shipper]. The requirement is not found in the language of COGSA; it is a judicial encrustation, de- signed to avoid what courts felt were harsh or unfair results. The requirement has been criticized for introducing uncertainty into ____________________ 7Though the published tariff in Ocean Lynx "provide[d] that __________ an ad valorem rate shall be applied to shipments of certain com- __ _______ modities [but did] not provide for the method through which a shipper of goods other than the listed commodities can avoid COGSA section 4(5)'s limitation on liability," 901 F.2d at 940, the court found that incorporation of COGSA into the bill of lading satisfied the "fair opportunity" requirement, id. The ___ argument rejected by the Eleventh Circuit is very similar to that advanced by McGee. See supra note 6. ___ _____ 11 commercial transactions that should be gov- erned by certain and uniform rules. Carman Tool, 871 F.2d at 900 (citations omitted); see also Vimar ____________ ___ ____ _____ Seguros y Reaseguros, S.A. v. M/V Sky Reefer, ___ F.3d ___, ___ ___________________________ _______________ (1st Cir. 1994) [No. 93-2179, slip op. at 4 (1st Cir. July 7, 1994)] ("COGSA was . . . intended to reduce uncertainty concern- ing the responsibilities and liabilities of carriers, responsi- bilities and rights of shippers, and liabilities of insurers.") (citations omitted); see generally Sturley, Parts I, II ___ _________ _______ (criticizing "fair opportunity" doctrine as economically ineffi- cient and inconsistent with COGSA's roots in international and domestic law).8 The bill of lading indisputably provided both ____________________ 8Further, nothing in the facts of this case counsels exten- sion of the "fair opportunity" doctrine. McGee has not shown that the absence of relevant published tariffs prevented PREPA from avoiding the COGSA liability limitation. We will not presume that PREPA, McGee's insured, would have declared addi- _______ tional value under a published tariff, especially since PREPA's contract with Henley obligated it to provide marine cargo insur- _________ __ ance for the full replacement value of the drilling rig. Compare ____ ___________ _____ _______ Travelers Indemn. Co. v. Vessel Sam Houston, 26 F.3d 895, 900 _____________________ ___________________ (9th Cir. 1994) (because shipper obtained insurance through an independent underwriter, "there is every reason to believe that [the shipper] made a deliberate choice to forego the additional cost that would have been incurred in raising [the COGSA] liabil- ity limit"). Indeed, Sea Barge proffered uncontroverted evidence that though it offered insurance, PREPA declined, opting instead to purchase insurance through McGee. Professor Sturley has suggested that in the typical case, the ad valorem rates for excess value offered by a carrier are __ _______ higher than premiums for equivalent cargo-insurance coverage from a third-party underwriter. See Sturley, Part II, at 194. A ___ _______ rational shipper confronted with such a choice is not likely to pay ad valorem rates when third-party insurance coverage is less __ _______ expensive. Moreover, a judicially-imposed tariff requirement would increase transaction costs to the carrier, with no corre- sponding benefit to either party. 12 actual and constructive notice of the COGSA 4(5) liability limitation.9 As there was no material fact in genuine dispute, the district court properly granted summary judgment for Sea Barge/Ayacol on the ground that the COGSA "package/CFU" liability limitation applies. 3. COGSA Package/Customary Freight Unit 3. COGSA Package/Customary Freight Unit ____________________________________ COGSA 4(5) limits liability to "$500 per package . . . or in case of goods not shipped in packages, per customary freight unit." 46 U.S.C. App. 1304(5). The district court concluded that the drill rig was shipped as a single "package." Strictly speaking, of course, it was not a "package." The parties agree that "the actual cargo that was lost overboard was a truck mounted Cabot 900 Drilling rig, which was self propelled and had eighteen (18) wheels . . . [and which] was not boxed or ___ _____ __ crated in any way." McGee's Mot. Opposing Def.'s Mot. for Summ. ______ __ ___ ___ J. at 5-6 (emphasis added); compare Sea Barge's Resp. to Pl.'s _______ Statement of Uncont. Mat. Facts at 4 (expressly admitting these facts). Moreover, we have held that a printing press shipped "in ____________________ 9McGee also argues that because David Kiester, the PREPA agent who negotiated the bill of lading with Sea Barge, allegedly was inexperienced in maritime matters, knowledge of the effect of COGSA 4(5) may not be imputed to PREPA. The only case McGee cites for this proposition, see Pan American World Airways, 559 __________________________ F.2d at 1177 (holding that "clause paramount" alone cannot be _____ used to impute knowledge of effect of COGSA to shipper), is inapposite. Moreover, we conclude that Kiester's inexperience is immaterial to our analysis. Cf. Carman Tool, 871 F.2d at 901 n.9 ___ ___________ ("So long as the bill of lading has all the necessary information [i.e., gives actual notice of COGSA 4(5)], the shipper, or any ___ ________ __ ___ other interested party, has the means of learning everything it _____ __________ _____ may wish to know about the terms of the transaction.") (emphasis added). 13 open view, unboxed, [which] was not wrapped or crated . . . was not a package as defined by COGSA." Hanover Ins. Co. v. Shulman ________________ _______ Transp. Enters., Inc., 581 F.2d 268, 275 (1st Cir. 1978); accord ______________________ ______ Tamini v. Salen Dry Cargo AB, 866 F.2d 741, 743 (5th Cir. 1989) ______ __________________ (free-standing portable drilling rig, "for the most part" fully exposed and not enclosed in a container, was not a COGSA "pack- age"); Petition of Isbrandtsen Co., 201 F.2d 281, 286 (2d Cir. ___________________________ 1953) (uncrated locomotive not COGSA "package"); 2A Benedict, ________ supra, 167, at 16-35 ("cargo that is shipped without any _____ packaging whatsoever is generally treated as 'not shipped in packages'") (citations omitted, citing numerous cases). How, then, since the shipper chose to describe the shipment as a single package can it now claim it constituted multiple units? Thus, the drilling rig constituted but one unit, whether labeled a "package" or, more correctly, one "customary freight unit" (CFU). Within the meaning of COGSA, the CFU "is generally the unit on which the freight charge is based for the shipment at issue." Binladen BSB Landscaping v. M.V. Nedlloyd _________________________ _____________ Rotterdam, 759 F.2d 1006, 1016 (2d Cir.), cert. denied, 474 U.S. _________ _____ ______ 902 (1985); Granite State, 825 F. Supp. at 1126.10 To deter- ______________ ____________________ 10Some early cases looked to shipping-industry custom in determining the CFU. See, e.g., Waterman S.S. Corp. v. United ___ ____ ____________________ ______ States Smelting, Ref. & Mining Co., 155 F.2d 687, 693-94 (5th ____________________________________ Cir.), cert. denied, 329 U.S. 761 (1946). But the clear modern _____ ______ trend is to "recognize the customary freight unit as the unit specifically employed by the parties in arriving at the rate charged for shipment," Granite State, 825 F. Supp. at 1126; see, _____________ ___ e.g., FMC Corp. v. S.S. Marjorie Lykes, 851 F.2d 78, 80 (2d Cir. ____ _________ ___________________ 1988); see also Jerome C. Scowcroft, Recent Developments Concern- ___ ____ ____________________________ ing the Package Limitation, 20 J. Mar. L. & Com. 403, 412 (1989) ___________________________ (discussing modern cases); 2A Benedict, supra, 168, at pp. 16- ________ _____ 14 mine the unit upon which freight was charged we look "to the parties' intent, as expressed in the Bill of Lading, applicable tariff, and perhaps elsewhere."11 Croft & Scully Co. v. M/V ___________________ ___ Skulptor Vuchetich, 664 F.2d 1277, 1282 (5th Cir. 1982); see FMC ___________________ ___ ___ Corp. v. S.S. Marjorie Lykes, 851 F.2d 78, 80 (2d Cir. 1988) (in _____ ___________________ determining the CFU, "district court should examine the bill of lading, which expresses the contractual relationship in which the intent of the parties is the overarching standard") (citations omitted). In support of its motion for summary judgment, Sea Barge argued that it charged a lump sum for transporting the drilling rig on the northbound voyage.12 Sea Barge relied on the bill of lading, PREPA's acceptance of the bid/purchase order (purchase order), and a facsimile from Sea Barge to PREPA quoting the charge for the northbound voyage ("quoted charge"). The purchase order and the quoted charge clearly establish that the freight charge was based on a lump sum: ____________________ 46 to 16-47 (same). 11Since the bill of lading is the contract of carriage between shipper and carrier, Grant Gilmore & Charles L. Black, Jr., The Law of Admiralty 93 (2d ed. 1975), familiar principles _____________________ of contract interpretation govern its construction, see Croft & ___ _______ Scully Co. v. M/V Skulptor Vuchetich, 664 F.2d 1277, 1282 (5th ___________ _______________________ Cir. 1982). 12It is undisputed that the freight charges for the south- ______ bound voyage, totalling $164,583, were calculated on a short-ton _____ basis, as evidenced by the bill of lading. It is not clear from the record exactly why the parties opted for a lump-sum contract rate on the northbound voyage, but the Lauderdale deposition suggests that Sea Barge's expenses would be lower for the trip to Houston because the barge to be used on the return leg was already positioned in Puerto Rico. 15 [PURCHASE ORDER] [PURCHASE ORDER] Charges will be as follows: a) Ocean Transportation --Drill rig & acc.: $86,400 lumpsum b) Port charges & handling fees --San Juan arrimo: $5.00/2,000 lbs --Houston Wharfage: 1.50/2,000 lbs --Houston truck loading: $7.50/2,000 lbs [QUOTED CHARGE] [QUOTED CHARGE] David, I have finalize [sic] shipping charges for this move and wish to give you our charges to move this rig to Houston, Texas. . . . Charges ocean transportation: Drill rig and accessories loose. $86,400.00 lumpsum . . . Port charges and handling fees: San Juan Arrimo $5.00 per 2000 lbs Houston Wharfage $1.50 per 2000 lbs Houston truck loading $7.50 per 2000 lbs The relevant portion of the bill of lading is substantially the same, though it does not use the term "lump sum."13 This evi- dence was sufficient to establish that Sea Barge was entitled to summary judgment on its claim that the northbound freight charge ____________________ 13 _________________________________________________ TARIFF ITEM NUMBER CHARGES TOTAL TARIFF ITEM NUMBER CHARGES TOTAL _________________________________________________ CONTRACT 86,400.00 _________________________________________________ _________________________________________________ TOTAL THRU FREIGHT _________________________________________________ WHARFAGE 1.50 st 1,322.25 _________________________________________________ TERMINAL USAGE(1)PR 5.00 st 4,407.50 _________________________________________________ TERMINAL USAGE(2)US 7.50 st 6,611.25 _________________________________________________ . . . TOTAL CHARGES -------- 98,741.00 -------- ________________________________________________ (Italicized characters are typed in the original; all other characters are pre-printed in the bill of lading.) 16 was based on a lump sum. See FMC Corp., 851 F.2d at 81 (bill of ___ __________ lading established that CFU was calculated on lump-sum basis). McGee argues that listing wharfage and terminal usage charges by short ton (st) on the bill of lading established the short ton as the CFU. We think this argument cuts the other way. The portion of the bill of lading reproduced above, see supra ___ _____ note 13, sets out the charge per short ton only for wharfage and ____ terminal usage, whereas the freight charge is stated in a lump sum. And this reading is buttressed by the quoted charge and the purchase order, which clearly evince the intent of the parties to calculate the freight charge on a lump-sum basis. Sea Barge having carried the initial burden on its motion for summary judgment, the burden shifted to McGee to point to competent evidence indicating a trialworthy issue. See Local ___ _____ 48 v. United Bhd. of Carps. & Joiners, 920 F.2d 1047, 1050 (1st __ ________________________________ Cir. 1990). In support of its claim that freight charges were based on the short ton, McGee proffered the Sea Barge invoice to PREPA relating to the northbound voyage, and a portion of the deposition testimony of William Lauderdale. The invoice is similar in all relevant respects to the portion of the bill of lading set out in the margin. See supra note 13. A flat $86,400 ___ _____ charge is made for "Ocean freight," while wharfage and terminal charges are listed on a short-ton basis. Although, as McGee points out, other portions of the invoice and bill of lading reflect that the drilling rig weighed 1,726,000 pounds, there is 17 nothing to link weight with the freight charge, and McGee made no _______ proffer supporting such a link.14 More importantly, the Lauderdale deposition tendered by McGee states that Lauderdale calculated the charges for the northbound voyage based on Sea Barge's expenses, including the ___ _______ ________ costs of operating the vessel; agency, port, stevedoring and container costs; as well as a profit margin. Nowhere does Lauderdale intimate that the drilling-rig weight was a factor in calculating the freight charge or in the parties' discussions of the freight charge for the northbound voyage. Thus, we find no competent evidence that the freight charge was based on anything other than a lump sum, see S.S. Marjorie Lykes, 851 F.2d at 80-81 ___ ___________________ (finding that bill of lading and tariff established that parties intended to calculate freight on lump-sum basis), which means that the drilling rig itself was the CFU in this case. Binladen, ________ 759 F.2d at 1016; see Union Carbide Corp. v. M/V Michele, 764 F. ___ ___________________ ____________ Supp. 783, 786 (S.D.N.Y. 1990) (CFU was transportable tank, since freight charge was computed on lump-sum basis). B. The Cross Appeal (No. 93-1548) B. The Cross Appeal (No. 93-1548) ______________________________ ____________________ 14Even evidence that Sea Barge used the weight of the drill rig to calculate its own costs may not have been dispositive. ___ See M/V Lash Italia, 858 F.2d at 193 ("[w]hile [carrier] may have ___ _______________ considered the vehicles' dimensions in setting its freight rates, the mere consideration of a particular measure does not render it a customary freight unit"); S.S. Marjorie Lykes, 851 F.2d at 80- ___________________ 81 (even though preliminary negotiations indicated that carrier was calculating freight based on price per ton, the fact that the bill of lading and tariff unambiguously reflected a lump-sum rate was controlling). 18 The Ayacol and Sea Barge cross-appeal challenges (1) the district court finding that the loading of the drilling rig was not controlled by PREPA to such an extent that Ayacol was exonerated from liability, and (2) the order denying Ayacol/Sea Barge an attorney fee award against McGee.15 We deem these claims waived due to cross-appellants' failure to object to the magistrate-judge's report and recommendation within the ten-day period prescribed by 28 U.S.C. 636(b)(1)(C). See Park Motor ___ __________ Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 605 (1st Cir. ___________ ________________ 1980)16 ("[A] party 'may' file objections within ten days or he may not, as he chooses, but he 'shall' do so if he wishes further [appellate] consideration.").17 See also Fed. R. Civ. P. 72(b) ___ ____ (same); D.P.R. Loc. R. 510.2(A) (failure to object to magistrate- ____________________ 15Prior to briefing and oral argument, McGee moved to dismiss the Ayacol/Sea Barge cross-appeal for failure to comply with D.P.R. Loc. R. 510.2(A) (failure to object to magistrate- judge's report within ten days waives right to appellate review). On written submissions by the parties, we denied the motion without prejudice, specifically preserving McGee's right to address this issue in its appellate brief. Ayacol/Sea Barge failed to respond to the waiver argument presented in McGee's brief, either at oral argument or in their principal brief on appeal, and filed no reply brief. Thus, we rely on the Ayacol/- SeaBarge submissions in opposition to McGee's motion to dismiss. 16The Supreme Court has made clear that the failure to make timely objection does not deprive the court of appeals of juris- diction. Thomas v. Arn, 474 U.S. 140, 146 n.4 (1985). ______ ___ 17We reject the contention that the Ayacol/Sea Barge claim sought to be raised on cross-appeal was preserved by an oblique footnote reference in their joint memorandum opposing McGee's ________ _______ objection to the magistrate-judge's report. Their joint memoran- _________ dum was not filed within the ten-day period prescribed by 28 U.S.C. 636(b)(1)(C). See Park Motor Mart., 616 F.2d at 605. ___ ________________ 19 judge's report within ten days waives absolute right to appeal district court order).18 Ayacol/Sea Barge urge that timely objection is required only when a party challenges a finding actually set out in the magistrate-judge's report and recommendation. Thus, they assert no exception to the report per se but challenge the "fail[ure] to ___ __ make the additional findings requested [in the motion for summary judgment]." We reject their contention, which would allow an aggrieved party to assert on appeal an argument never surfaced in the district court; namely, in this case, that the magistrate- judge's report failed to respond to the portions of the motion dealing with exoneration of liability and attorney fees. See ___ United States v. Nu ez, 19 F.3d 719, 722 n.8 (1st Cir. 1994) _____________ _____ (arguments not seasonably addressed to trial court may not be surfaced for first time on appeal) (citing cases).19 Finally, ____________________ 18The report and recommendation warned that "failure to comply with [D.P.R. Loc. R. 510.2(A)] precludes further appellate review." See United States v. Valencia-Copete, 792 F.2d 4, 6 ___ _____________ _______________ (1st Cir. 1986) (directing inclusion of notice of waiver in magistrate-judge's reports). 19Ayacol/Sea Barge point to Orthopedic & Sports Injury _____________________________ Clinic v. Wang Labs., Inc., 922 F.2d 220 (5th Cir. 1991), as ______ _________________ support for their theory. In Wang, plaintiffs did not object to ____ the magistrate-judge's report with respect to its failure to treat plaintiffs' res ipsa loquitur defense against partial ___ ____ ________ summary judgment. The Fifth Circuit rejected the defendant's argument that Thomas v. Arn barred the claim, stating: "[plain- ______ ___ tiff] is still able to request that the issue be considered on __ _______ appeal, even if it did not question the magistrate's findings." Wang, 922 F.2d at 225 (emphasis added), citing Thomas, 477 U.S. ____ ______ ______ at 148-49. Although the court did not detail the reasons for its decision, the referenced portion of Thomas states: "we need not ______ decide whether the Act mandates a waiver of appellate review absent [timely objection to the magistrate-judge's report]. We hold only that it does not forbid such a rule." Id. No other ___ 20 the proposed bypass of the Article III judge would undermine the established role of the magistrate judge in the federal system: The purpose of the Federal Magistrates Act is to relieve courts of unnecessary work. Since magistrates are not Article III judges, it is necessary to provide for a redetermination by the court, if requested, of matters falling __ _________ within subsection (b)(1)(B). To require it __ _______ __ if not requested would defeat the main pur- __ ___ _________ _____ ______ ___ ____ ____ pose of the act. ____ __ ___ ___ Park Motor Mart, 616 F.2d at 605 (footnote omitted) (emphasis ________________ added); see also id. at 605 n.1 ("Nor can it be thought that a ___ ____ ___ party could skip the district court and, in effect, appeal directly to us. We have no jurisdiction to review the determina- tions of magistrates").20 We affirm the district court judgment for Sea We affirm the district court judgment for Sea _______________________________________________________ Barge/Ayacol, dismiss the Sea Barge/Ayacol cross-appeal, and Barge/Ayacol, dismiss the Sea Barge/Ayacol cross-appeal, and _________________________________________________________________ remand for further proceedings consistent with this opinion. All remand for further proceedings consistent with this opinion. All ___________________________________________________________ ___ parties are to bear their own costs. parties are to bear their own costs. ___________________________________ ____________________ court has cited Wang on this point. We think Wang is better seen ____ ____ as support for the view that a court of appeals has discretion to __________ adopt a rule allowing a party to raise a claim not preserved before magistrate-judge. Since this case presents no suitable occasion for such a rule, see Park Motor Mart, 616 F.2d at 605, ___ ________________ we find Wang to be inapposite. ____ 20Additionally, we note that these claims likely would not succeed on the merits. Ayacol cites no case holding that a stevedore's duty of care may be delegated, in toto, to its marine __ ____ surveyor. The district court case cited for this proposition, see Royal Embassy of Saudi Arabia v. S.S. Ioannis Martinos, 1986 ___ _____________________________ _____________________ A.M.C. 769 (E.D.N.C. 1984), merely found a right to contribution ____________ from the marine surveyor. As concerns the request for attorney fees, Sea Barge/Ayacol established no conduct on the part of McGee which would warrant a fee award. 21